## IN THE UNITED STATES DISTRICT
### FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**JOHN WHYDE, JR.,**                    CASE NO. 3:19 CV 683

      Plaintiff,

      v.                              JUDGE JAMES R. KNEPP II

**PAUL A. SIGSWORTH, et al.,**

      Defendants.                     **MEMORANDUM OPINION AND
ORDER**

### INTRODUCTION

This is a prisoner civil rights suit brought by Plaintiff John Whyde, Jr. related to his incarceration at the Erie County Jail in late March and early April 2017.[1] He brings claims of excessive force, deliberate indifference, and intentional infliction of emotional distress against Defendants Erie County, Erie County General Health District Board of Health, Wendell Craig Eldridge, Amber Burgess, and Heather Cromwell (hereinafter "Health Defendants"), as well as against Erie County/Erie County Board of Commissioners, Paul A. Sigsworth, Jason Beatty, Scott J. Hamernik, Kaine Kerr, Jeanette Barrett, Jon Salyers, Robert J. Paytosh, and Thomas Casey Proy (hereinafter "County Defendants"). Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367. Currently pending before the Court are the County Defendants' Motion for Partial Summary Judgment (Doc. 125), and the Health Defendants' Motion for Summary Judgment

---

1. This case in its entirety encompasses two sets of claims – one related to Plaintiff's treatment while incarcerated in 2017 and one related to Plaintiff's 2019 arrest and incarceration. The Court established separate motion practice deadlines for the 2017 and 2019 claims (Doc. 46; Non-document entry dated January 13, 2021), and the instant opinion only addresses the 2017 claims.

(Doc. 126). Both motions are fully briefed and ripe for decision.[2] For the reasons discussed below, the Court grants both motions.

BACKGROUND

The claims in the instant motions relate to Plaintiff's incarceration from March 27, 2017 through April 1, 2017 in the Erie County Jail.

*Past Medical History*

Plaintiff's medical history includes a back injury in 2003 involving a ruptured disc. (Whyde Depo., at 39-40, 75). He began taking opiate painkillers at that time, and was still taking them at the time of the incidents relevant herein. *Id.* He further suffered injuries to his left leg, knee, and ankle as a result of a 2014 motorcycle accident, which resulted in ongoing pain issues. *Id.* at 36-37.

Plaintiff received opiate pain medications from Dr. William Bauer starting around 2007 and from Dr. William Schlotterer starting around 2012. *See* Doc. 125-5, at 7-36. Dr. Schlotterer also prescribed Xanax. *See id.* at 34-36.

*Booking / Initial Evaluation and Treatment*

Plaintiff was booked into the Erie County Jail on March 27, 2017 for failure to appear for a final plea hearing on pending felony charges. *See* Doc. 117-1; Whyde Depo., at 78, 92. A correctional officer completed an intake screening form, on which he observed Plaintiff appeared to be withdrawing from "opanes, oxymorfom, [and] oxycodone". (Doc. 117-1, at 1). Plaintiff testified he told the booking officer he would be in withdrawal from Opana, Oxycodone, and Xanax. (Whyde Depo., at 97). Under the inmate questionnaire section, in response to a question

---

2. Following the Sixth Circuit's decisions in *Brawner v. Scott Cty.*, 14 F.4th 585 (2021), and *Greene v. Crawford Cty.*, 22 F.4th 592 (2022), the Court sought (Doc. 173) – and the parties submitted (Docs. 180, 184, 185, 186) – supplemental briefs regarding the modified deliberate indifference standard as applied to pretrial detainees.

about current and/or past mental health problems, the officer noted "yes", and "Narotin, Tripolta, Xanex, Symbolta [sic]". (Doc. 117-1, at 1). The form further shows Plaintiff endorsed conditions of arthritis, high blood pressure, bulging lower back disc, and fainting and/or head injury. *Id.* at 1-2. The jail's practice is to pass a physical copy of this form to the jail nurse, either by hand delivering, or placing it in the nurses' mailbox, and it is available electronically. (Proy Depo., Doc. 114, at 42).

The following day, March 28, 2017, Nurse Amber Burgess conducted a health appraisal of Plaintiff. (Burgess Depo., at 26-29); (Doc. 117-2).[3] Part of conducting such an appraisal includes looking at the intake screening form, but Burgess could not recall whether she did so in this case. (Burgess Depo., at 32-36). Plaintiff says he told Burgess he used two different Wal-Mart pharmacies (Fremont and Sandusky), along with Drug Mart and Bellevue Medicine Shop. (Whyde Depo., at 106-08, 112-13). And he further testified he told Burgess he was taking Xanax. *Id.* at 112-16. On the form, Burgess documented Plaintiff's current medications as Opana, Oxycodone, Neurontin, and Trileptal, his pharmacy as Wal-Mart Fremont, and the name of his family physician, Dr. Schlotterer. (Doc. 117-2, at 1). She also documented Plaintiff was experiencing symptoms of withdrawal of being hot and dizzy; she further observed and recorded unremarkable vital signs and mental status observations. *Id.* at 1-3.[4]

---

3. The Erie County Jail – through the Erie County Commissioners has contracts with the Erie County General Health District for medical services, and arrangements with Firelands Counseling and Recovery Services and Bayshore Counseling for mental health and addiction-related services. *See* Doc. 125-4; Sigsworth Depo., at 36-44. Through the Health District Contract, the Health District supplied a jail doctor to provide medical services, as well as nurses to provide nursing services. *See* Doc. 125-4.

4. Nurse Heather Cromwell worked at the jail in a shadowing position for a total of four days – March 28-31, 2017. (Doc. 124, at 9-10). Nurse Cromwell was shadowing Nurse Burgess at the time she completed Plaintiff's health appraisal. *Id.* at 14. Cromwell gave Plaintiff a tuberculosis skin test in this capacity, and noted it on the form. *Id.* at 11, 15; *see also* Doc. 117-2, at 1.

Plaintiff says Nurse Burgess asked if he was related to Billy Whyde, and when he informed her Billy was his brother, she "went from miss nice to evil eye and just treated me like crap." (Whyde Depo., at 104). He further testified Lt. Proy was present during Nurse Burgess's examination. *Id.*

Nurse Burgess contacted the Wal-Mart pharmacy in Fremont, which verified current prescriptions for Opana, Neurontin and Trileptal. (Burgess Depo., at 43-44, 68-70); Doc. 117-3. She thereafter left a message for Dr. Eldridge for a medication order for Plaintiff. (Burgess Depo., at 70); (Doc. 117-3). Dr. Eldridge ordered an opiate detoxification protocol substituting Clonidine, Bentyl, Hydroxyzine, and ibuprofen in place of Opana. (Eldridge Depo., Doc. 117, at 32-35); Doc. 117-3. Neurontin and Trileptal were continued. *See* Doc. 125-5, at 63. Plaintiff could not remember exactly what medications he received aside from Clonidine (Whyde Depo., at 117-20), and the Medication Administration Record indicates Plaintiff began receiving medication on the morning of March 28, 2017. (Doc. 125-5, at 63-66)

Plaintiff testified after his health appraisal, he experienced withdrawal symptoms including loss of appetite, sweating, hallucinations, difficulty sleeping, and feeling "deathly ill". (Whyde Depo., at 122-23, 126-27, 131). Plaintiff admitted he declined to take the provided medications at some point, but could not directly recall the exact date or number of times he did so. (Whyde Depo., at 120-21). The Medication Administration Record and later Progress Notes indicate Plaintiff refused his medications both the morning and afternoon of March 31, 2017. (Doc. 125-5, at 64-66); (Doc. 117-3, at 1).

*Interactions with Beatty*

At 2:30 in the afternoon of March 31, 2017, Officer Beaty saw Plaintiff hit his cell door and yell about wanting to take a shower. (Beatty Depo., at 48-49, 74-75); Doc. 111-2 (incident

report). Officer Beatty took Plaintiff for a shower. (Whyde Depo., at 128-29). During this time, Plaintiff told Officer Beatty he was in withdrawal, not feeling well, and "seeing stuff". *Id.* at 143. Officer Beatty testified Plaintiff complained to him about a medication issue. (Beatty Depo., at 45-46). In response, he relayed that information to Nurse Burgess, *id.* at 46, who visited Plaintiff's cell at 3:00 p.m. that day. (Doc. 117-3, at 1). Burgess observed Plaintiff was agitated, belligerent, and sweaty; she recorded vital signs of 186/110 blood pressure, pulse 98, and respiration 22. *Id.* She wrote it "should be noted inmate has refused both AM + afternoon meds" and that Officer Beatty was aware. *Id.*

Dr. Eldridge testified it would be reasonable for a nurse to conclude Plaintiff's vital signs were a result of his refusal to take Clonidine earlier in the day "because . . . what Clonidine does on top of lessening agitation is it also reduces blood pressure. It is an alpha-blocker, and it actually is a blood pressure med, so by refusing Clonidine twice that day and being worked up and yelling, that would make it - - that would make sense that his blood pressure would be up." (Eldridge Depo., at 92). He further testified that "certainly a blood pressure of 186/110 does not necessitate a trip to the ER." *Id.*

At Nurse Burgess's request, Officer Beatty accompanied her to Plaintiff's cell in the evening to help convince Plaintiff to take his medication. (Beatty Depo., at 92-99). Plaintiff said he thought he was being poisoned; Beatty successfully talked to Plaintiff and persuaded him to take the medications. *Id.*; *see also* Doc. 117-3 (progress note from March 31, 2017 at 8:00 p.m. stating that "with the assistance of jail staff, medication was able to be administered[.] Inmate continued to be beligerent [sic] to this writer and jail staff.").

When Officer Beatty's shift ended, he told the shift relief officer, Sgt. Hamernik, that Plaintiff was having issues with his medication. (Beatty Depo., at 99). Officer Beatty testified he

felt "very comfortable" with Nurse Burgess and "her desire to want the inmate to – take the medication." *Id.* at 105. After Plaintiff took the medication, Officer Beatty thought the problem was resolved. *Id.*

*Cell Removal*

Early the next morning, Plaintiff "was repeatedly pounding on the cell door and windows with his hands" and as a result, Hamernik decided to remove him from the cell and place him in the restraint chair "[t]o prevent him from causing any harm to himself and striking that cell door and window repeatedly." (Hamernik Depo., Doc. 112, at 126); *see also* Salyers Depo., Doc. 116, at 10-13; Paytosh Aff., Doc. 125-2, at ¶ 7; Barrett Aff. Doc. 125-3, at ¶ 7; Doc. 116-5, at 1 Plaintiff admits he "began banging on his cell door and windows and slamming his food tray around" and that he continued despite officers' requests for him to stop. (Doc. 74, at ¶ 61); Whyde Depo., at 136, 141.

The cell removal from around 2:30 a.m. the morning of April 1, 2017 was captured on video by an officer in training with Officer Barrett. (Doc. 125-3, at ¶7). The video depicts that prior to opening the door to Plaintiff's cell, Hamernik asked Plaintiff six times to "back up and cuff up", and he did not comply. *See also* Doc. 74, at ¶ 63 ("Sgt. Hamernik ordered Mr. Whyde to put his hands through the chute but he refused."). He subsequently asked Plaintiff to lie down, and he did not. *See also* Doc. 74, at ¶ 64 ("Sgt. Hamernik and CO Kerr then both ordered him to lie down, but Mr. Whyde did not comply, as by this time he believed the COs were about to execute him.").

Kerr entered the cell first. Plaintiff stood near the holding cell door. Kerr told Plaintiff twice to "turn around" while pointing his finger at Plaintiff and walking toward him. Plaintiff walked backwards, but did not turn around and said something undiscernible while facing Kerr;

Kerr then took him down to the cell floor. The takedown itself is not clearly depicted by the video due to the close quarters of the cell and other officers' bodies blocking the camera's view. The last visible action is Kerr's right hand reaching for Plaintiff's left shoulder, and then next shows Plaintiff on the floor on his back with Kerr on top of him. Officers Salyers, Hamernik, and Paytosh had followed Kerr into the cell in quick succession, and then Officer Barrett joined.

Kerr testified he grabbed Plaintiff by his shoulders, "pulled him backwards", and took him to the floor using a technique he learned at the training academy. (Kerr Depo., at 74); *see also* Kerr Depo., at 76 ("I went in and told him to turn around. I would have taken him down forward, but he resisted that way, so when he resists and his weight is going backwards, I pull him backwards."). Plaintiff testified he remembered being thrown against the wall and being "pretty sure I got knocked out." (Whyde Depo., at 154). Elsewhere, he said he "wasn't slammed [against the wall]" but "was throwed [sic] in the air . . . He threw me like a rag doll. You could hear me bounce." *Id.* at 153.[5] Salyers testified he did not see Plaintiff hit the floor, "but there was a noise, a banging noise just like there always is because somebody got taken to the floor, and it was hard." (Salyers Depo., at 50).

Once on the floor, the video depicts all five officers attempting to gain control of Plaintiff. Plaintiff admits he was resisting officers' efforts at this point because when they entered the cell, he was hallucinating and thought officers were going to kill him and he "didn't know what was real at times". (Whyde Depo., at 146-49); Doc. 74, at ¶ 64 ("Mr. Whyde did not

---

5. Plaintiff further cites additional evidence to support his assertion that Kerr slammed his head into the wall. *See* Doc. 137-12 (Affidavit of John Henry Contreras); Doc. 137-11 (Affidavit of Kevin Lackner). Both affidavits recount a conversation with Defendant Salyers in which Salyers allegedly made statements regarding "the young CO on duty" hitting Plaintiff's head against the wall with great force. (Contreras Aff., at ¶ 3); (Lackner Aff. at ¶ 3). But Defendants correctly note these statements are hearsay as applied to any Defendant but Defendant Salyers, and Plaintiff has presented no argument in opposition. *See* Fed. R. Evid. 801(d)(2)(A) (hearsay exception for statement offered "against an opposing party").

comply, as by this time he believed the COs were about to execute him."); ¶ 69 ("The five COs attempted to subdue, cuff and shackle Mr. Whyde, while he resisted, believing they were going to kill him."). The officers' bodies obscure some of the view, but Officers Kerr and Hamernik were near Plaintiff's upper body, attempting to apply handcuffs, while Officers Salyers and Paytosh worked on leg shackles. *See also* Salyers Depo., at 17, 21. Officer Barrett had not intended to go into the cell, but when the officers "seemed to be stuck", she entered the cell to help gain control. (Doc. 125-3, at ¶12). At some point during the struggle, Plaintiff grabbed the radio from Barrett's chest and broke it. *See also* Doc. 74, at ¶ 69; Doc. 125-3, at ¶ 13. Plaintiff testified that during this struggle, Officer Salyers stood on his leg, causing him to scream out in pain. (Whyde Depo., at 150). The officers were unsuccessful at getting Plaintiff's hands cuffed behind his back, so they ultimately handcuffed him in front.

During the struggle on the cell floor, the video reflects Plaintiff was struggling, grunting, verbalizing things that are largely undiscernible, and at times yelling out.

*Restraint Chair*

After Plaintiff was handcuffed and shackled, officers carried him out of the cell. They then began working to restrain him in the restraint chair. Plaintiff continued yelling and actively resisting their efforts. Officers Kerr, Barrett, and Salyers each at some point are in the position of trying to maintain control of Plaintiff's head. Kerr testified that he was holding Plaintiff's cheeks and under his jaw "to keep his head stabilized" using a technique he learned at the correctional academy. (Kerr Depo., at 35-36). Plaintiff is seen spitting and Officer Kerr places a spit shield over his head. The spit shield appears to rip in the process. Once Plaintiff is secured in the chair, Officer Paytosh wheels him down the hall and into the corner of a cell. Jail records indicate Sgt. Hamernik removed the spit shield approximately 30 minutes later at 3:18 a.m. (Doc. 115-6, at 1).

8

Shortly after Plaintiff's placement in the restraint chair, Sgt. Hamernik contacted Firelands Regional Medical Center, the mental health provider for the jail. (Doc. 112, at 105-06). A social worker arrived at 4:00 a.m. to assess Plaintiff. *Id.* at 105-07. The social worker advised placement at Northern Ohio Psychiatric Hospital, but that Plaintiff needed to be medically cleared first. *Id.* at 107-08.

Sgt. Hamernik then contacted Lt. Proy to advise him of the situation. (Doc. 112, at 107, 113). At Lt. Proy's direction, between 4:00 and 4:50 a.m., Sgt. Hamernik contacted Nurse Burgess (who was off-duty, but on call) to determine if emergency treatment was necessary. *Id.* at 111-13). Hamernik testified Burgess advised she would evaluate Plaintiff when she arrived between 6:00 and 7:00 a.m. *Id.* at 113. Lt. Proy testified that obtaining medical clearance for inpatient psychiatric care is not considered an emergent situation. (Doc. 114, at 36). Plaintiff testified that he was hallucinating and in and out of sleep during his time in the restraint chair. (Whyde Depo., at 157-70).

*Transportation to Hospital & Treatment*

Around 7:00 a.m., Lt. Proy contacted the Chief Deputy to make arrangements for Plaintiff to be transported to the hospital for medical clearance. (Doc. 114, at 30-36). Plaintiff fought with the officers who transferred him from the restraint chair to handcuffs and leg shackles for placement on a stretcher with Emergency Medical Services. (Doc. 115, at 54). EMS transported him to the hospital at 9:01 a.m. (Doc. 138-8, at 1). EMS noted Plaintiff "had a contusion on his head from the night prior". *Id.* at 2.

Upon arrival, the emergency room physician observed Plaintiff was "not verbally coherent", "acting bizarre" and "hallucinating at times" (Doc. 125-5, at 48) and he had "a[n] abrasion to his forehead" (Doc. 138-7). A CAT scan "did not show any acute pathology

intracranially". (Doc. 125-5, at 48). The physician observed that Plaintiff had "a long standing history of taking high-dose opiates, including Opana and oxycodone . . . as well as high doses of Xanax and, from the best that I can tell, when he landed in jail all of these substances were withheld, which caused him to go into a significant polysubstance withdrawal." *Id*. at 54. His discharge diagnoses included acute psychotic disorder due to acute polysubstance withdrawal; there were no physical diagnoses. *Id.* at 53. The discharge summary from April 5, 2017 says "between his stay at the jail and his stay in the intensive care unit here, he was effectively detoxified from his opiates." *Id.* at 55.

Plaintiff's expert witness, Dr. William Bauer, testified that "abrupt cessation of the patient's opioids long and short acting and the benzodiazepine Xanax produced a withdrawal delirium psychosis and probable withdrawal seizure." (Bauer Depo., Doc. 133, at 79); *see also* Bauer Report, Doc. 137-5, at 5. Dr. Bauer's testimony continues:

> Q. With respect to that, is it the combination of the withdrawals or would either one in themselves be sufficient to produce the, as you call it, withdrawal, delirium, psychosis improbable withdrawal seizure?
>
> A. Well, that's both that's a double whammy.
>
> Q. Does it take both? Are both –
>
> A. Either one can produce a seizure, whether or not, you know – let's say maybe he didn't have a seizure. Which I don't know, maybe he didn't. I don't know. I think he did.

(Bauer Depo., at 79-80).

Dr. Eldridge also testified that a person on a benzodiazepine "need[s] to be tapered" off it. (Eldridge Depo., at 11-12); *see also id.*at 43 ("If you're withdrawing from Benzo's, you give Benzo's.").

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id*. The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

## DISCUSSION

Plaintiff brings two § 1983 claims: (1) excessive force related to various correctional officers' actions in removing him from his cell and the actions that followed, including the use of a restraint chair; and (2) deliberate indifference to medical needs related to his treatment while incarcerated. He also brings a state-law intentional infliction of emotional distress claim. For the

reasons discussed below, the Court grants both the County Defendants' Motion for Summary Judgment and the Health Defendants' Motion for Summary Judgment.

Section 1983 Claims

Plaintiff brings deliberate indifference and excessive force claims under 42 U.S.C. § 1983. Section 1983 makes liable "[e]very person" who "under color of" state law "subjects, or causes to be subjected," another person "to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]" 42 U.S.C. § 1983. "[A] § 1983 plaintiff generally must prove both that a defendant was *personally* at fault and that the defendant's culpable conduct (not somebody else's) *caused* the injury." *Pineda v. Hamilton Cty.*, 977 F.3d 483, 490 (6th Cir. 2020). "[A] plaintiff must plead that each Government-official defendant, through the officials own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) (plaintiff must prove "that the violation was committed *personally* by the defendant."). Thus, "in the face of [a] motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." *Pineda*, 977 F.3d at 491 (quoting *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018)).

*Qualified Immunity*

Defendants have raised the defense of qualified immunity in response to Plaintiff's claims. This doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from

12

harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity is an affirmative defense; once a defendant raises it, the burden shifts to the plaintiff to demonstrate: (1) the defendant's acts violated a constitutional right; and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct. *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014).

To defeat the qualified immunity defense, the plaintiff is required to plead facts demonstrating a violation of a constitutional right that is clearly established in a "particularized sense." *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015) (finding the right to be free from malicious prosecution, though a clearly established constitutional right, is not sufficiently particularized in the context of a qualified immunity defense). That is, the right said to have been violated must be defined "in light of the specific context of the case, not as a broad general proposition." *Id.* (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). In this context, "clearly established" means "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotations omitted)). "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Therefore, to overcome a qualified immunity defense, a plaintiff generally "must identify a case that put [the officers] on notice that [their] specific conduct was unlawful." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam). A case does not satisfy this notice requirement if its facts are "materially distinguishable" from the facts officers confronted. *Id.*

Deliberate Indifference

Plaintiff brings a deliberate indifference claim against "Defendants Proy, Burgess, Cromwell, Eldridge, Beatty, Erie County, Erie County General Health District Board of Health, Erie County Health Department, Sigsworth, and Jane and John Doe health care providers". (Doc. 74, at 28).[6]

The Eighth Amendment prohibits cruel and unusual punishments, U.S. Const. amend. VIII, and "includes a right to be free from deliberate indifference to an inmate's serious medical needs", *Brawner v. Scott Cty.*, 14 F. 4th 585, 591 (6th Cir. 2021). "But the Eighth Amendment does not apply to pretrial detainees" like Plaintiff who "[i]nstead . . . have a constitutional right to be free from deliberate indifference to serious medical needs under the Due Process Clause of the Fourteenth Amendment." *Greene v. Crawford Cty.*, --- F.4th ---, 2022 WL 34785, at *7 (6th Cir.). As a pretrial detainee, Plaintiff's "due process rights to medical care 'are at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Griffith v. Franklin Cty*, 975 F.3d 554, 566 (6th Cir. 2020) (quoting *City of Revere v. Mass Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

Until recently, Fourteenth Amendment and Eighth Amendment deliberate indifference claims were analyzed "under the same rubric". *Brawner*, 14 F. 4th at 591 (internal quotation and citation omitted). The Eighth Amendment framework for deliberate indifference claims includes an objective and subjective component. *Griffith*, 975 F.3d at 566. "The objective component

---

6. In their Motion for Summary Judgment, the County Defendants clearly pointed out that Plaintiff did not plead a deliberate indifference claim against Sgt. Hamernik or Officers Kerr, Salyers, Paytosh, and Barrett. *See* Doc. 125-1, at 34. Plaintiff did not address this directly in his responsive brief. *See* Doc. 138. In his supplemental brief regarding the County Defendants, Plaintiff belatedly attempts to argue he *did* bring a deliberate indifference claim against these Defendants. *See* Doc. 186, at 1-4. But upon review, the Court agrees with Defendants – Plaintiff did not plead a deliberate indifference claim against these officers. *See* Doc. 74, at ¶¶ 121-36. The County Defendants' Motion to Strike this brief (Doc. 191) is therefore denied as moot.

requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the [Constitution]." *Id.* at 567 (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018)). The subjective component requires a plaintiff to show that "each defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk by failing to take reasonable measures to abate it." *Id.* at 568 (quoting *Rhinehart*, 894 F.3d at 738). This is a high standard of culpability, "equivalent to criminal recklessness." *Id.*

The Sixth Circuit's majority opinion in *Brawner*, 14 F.4th 585, "changed things." *Greene*, 2022 WL 34785, at *7. There, relying on the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) – an excessive force claim involving a pretrial detainee – the Sixth Circuit found that "*Kingsley*'s reasoning required 'modification of the subjective prong of the deliberate-indifference test for pretrial detainees.'" *Id.* (quoting *Brawner*, 14 F.4th at 596). Therefore, the Court held to satisfy the "subjective prong" of a deliberate indifference claim, "[a] pretrial detainee must prove 'more than negligence but less than subjective intent—something akin to reckless disregard." *Brawner*, 14 F.4th at 597 (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)). "In other words, a plaintiff must prove the defendant acted 'deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Greene*, 2022 WL 34785, at *8 (quoting *Brawner*, 14 F.4th at 597). "Mere negligence", however, remains "insufficient." *Brawner*, 14 F.4th at 596.

Therefore, to survive summary judgment on a deliberate indifference claim, *Brawner* explained Plaintiff must "present evidence from which a reasonable jury could find that (1) that [the detainee] had an objectively serious medical need; and (2) that [the defendant's] action (or

15

lack of action) was intentional (not accidental) and she either (a) acted intentionally to ignore [the detainee's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to" the detainee. *Brawner*, 14 F.4th at 597. But, "the post-*Brawner* deliberate indifference inquiry still requires consideration of an official's actual knowledge of the relevant circumstances." *Trozzi v. Lake Cty.*, -- F.4f --, 2022 WL 909411, at *5 (6th Cir. Mar. 29, 2022). Most recently, in *Trozzi*, the Sixth Circuit summarized the standard as follows:

> [A] plaintiff must satisfy three elements for an inadequate-medical-care claim under the Fourteenth Amendment: (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would post a serious risk to the pretrial detainee and ignored that risk.

*Id.* at *7. Importantly, this standard still "ensur[es] that there is a sufficiently culpable mental state to satisfy the 'high bar' for constitutional torts grounded in a substantive due process violation." *Id.* And it remains true that the Court "cannot 'impute knowledge from one defendant to another[,]' [rather it] must 'evaluate each defendant individually[.]'" *Greene*, 2022 WL 34785, at *8 (quoting *Speers v. County of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006)).

<u>Officer Beatty & Lieutenant Proy</u>

Plaintiff asserts Officer Beatty failed "to ensure that Whyde received prompt and adequate medical care"; he contends Lieutenant Proy "failed to ensure that Whyde received a prompt and adequate medical assessment upon admission to the jail on March 27, 2017." (Doc. 74, at ¶¶ 127 9-31). Defendants Beatty and Proy assert qualified immunity in response to Plaintiff's deliberate indifference claim. They contend Plaintiff cannot show either violated his

constitutional rights, nor that either violated any clearly established law. The Court finds both are entitled to summary judgment.

As to Officer Beatty, in opposition, Plaintiff contends "Defendant Beatty's only transgression is that he failed to summon medical staff when Mr. Whyde told him of the pain of his withdrawal and he failed to inform Defendant Hamernik that Mr. Whyde had not committed a rule violation that required disciplinary action." (Doc. 138, at 41). Plaintiff's brief contains no citation to the record on this point nor any further argument. Moreover, the former is not an accurate description of the evidence, and it is unclear what the latter has to do with a deliberate indifference to serious medical needs claim.

The evidence reflects that Officer Beatty informed Nurse Burgess that Plaintiff reported complaints, and Nurse Burgess visited Plaintiff's cell to check his vital signs thereafter. (Beatty Depo., at 45-46; Doc. 117-3, at 1). Officer Beatty was entitled to rely on Nurse Burgess's medical judgment that nothing further was required at that point. *See McGaw v. Sevier Cty.*, 715 F. App'x 495, 498-99 (6th Cir. 2017) ("Where, as here, an officer responds to a substantial risk of serious harm by asking for and following the advice of a professional [that] the officer believes to be capable of assessing and addressing that risk, then the officer commits no act of deliberate indifference in adhering to that advice."); *see also Winkler v. Madison Cty.*, 893 F.3d 877, 895 (6th Cir. 2018) ("There is no evidence in the record that Dr. Al-Shami asked Deputy LaGrange to obtain any additional information (vital signs or history), let alone that the deputy failed to comply with such a request. Deputy LaGrange was entitled to rely on Dr. Al-Shami's apparent conclusion that no additional information about Hacker's condition was needed."); *see also Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009) (concluding that nonmedical jail personnel are entitled to reasonably rely on the assessments made by the medical staff). Officer

Beatty thus made an "active effort" to address Plaintiff's medical condition, and cannot be said to have acted with reckless disregard to Plaintiff's medical needs. *Cf. Britt v. Hamilton Cty.*, 2022 WL 405847, at *5 (6th Cir.) (finding correctional officer's choice to place an inmate in a restraint chair to calm him down and prevent self harm, and where he would be monitored by medical professionals, "reflected an 'active effort' to respond to any concerns about [the inmate's] medical condition and did not amount to deliberate indifference").

As to Lieutenant Proy, in their opening brief, Defendants argued entitlement to summary judgment. *See* Doc. 125-1, at 54-56. Plaintiff presented no clear response to this argument. *See* Doc. 138. And, indeed, Proy's name does not appear at all in Plaintiff's supplemental briefing. *See* Docs. 185, 186. The Court therefore finds Plaintiff has abandoned such a claim. *See Palma v. Johns*, -- F. 4th --, 2022 WL 594046, at *6 n.1 (6th Cir.) ("Generally, at the summary judgment stage, the non-moving party can forfeit an argument if they fail to respond to the moving party's arguments."); *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

Plaintiff has thus presented no evidence to demonstrate a material dispute of fact that Officer Beatty or Lieutenant Proy recklessly failed to act reasonably to mitigate a serious risk of harm. Moreover, Defendants' assertion of qualified immunity shifts the burden to Plaintiff to demonstrate a defendant violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *al-Kidd*, 563 U.S. at 741. Plaintiff has not done so with respect to these Defendants. Both are therefore entitled to summary judgment on Plaintiff's deliberate indifference claim.

18

<u>*Monell* Claim Against County Defendants</u>[7]

Plaintiff asserts a *Monell* claim against Sigsworth, Proy, and the County. *See* Doc. 74, at ¶¶ 122-26. He contends the County/Sheriff have customs, policies, or practices which prohibit inmates from receiving prescribed opiates or benzodiazepines while in the Erie County jail and these policies caused Plaintiff's injuries. Defendants move for summary judgment, asserting the undisputed evidence shows the County has no such policy, and in fact, the policy requires deferral to the third-party medical provider regarding any medical treatment. *See* Doc. 125-1, at 57-59. Plaintiff does not present a specific argument in opposition. *See* Doc. 138. He does however assert, twice, without citation that Sigsworth had a custom or policy of not permitting certain drugs in the Erie County Jail. *See id.* at 41 ("Defendant Sigsworth's . . . custom of not permitting certain drugs in his jail, no matter how many times he attempts to place the blame on the doctors defeats a qualified immunity defense for him also."); *id.* at 8 n.3 ("if an unwritten policy or custom exists where opiates, benzodiazepines, suboxone, methadone or other drugs are not permitted to be dispensed in the jail and the doctor under contract for dispensing medications to the jail <u>never</u> dispenses the above-named medications, then the non-dispensing is no longer a discretionary act of the doctor but is a custom of the jail which the Sheriff and others are responsible for.").

It is well established that a municipal entity may not be sued for injuries inflicted solely by its employees or agents under § 1983. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 (1978). A plaintiff may only hold a municipal entity liable under § 1983 for the entity's own

---

7. As with the excessive force claim below, Plaintiff pleads no facts suggesting Sigsworth had any direct involvement with Plaintiff's treatment while incarcerated. As such, any individual capacity claim must be dismissed. *See Essex v. City of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013) ("For individual liability on a failure-to-train or supervise theory, the defendant supervisor must be found to have encouraged the specific incident of misconduct or in some other way directly participated in it.") (internal quotation omitted).

wrongdoing. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) ("Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior.*" (citing *Monell,* 436 U.S. at 692–94)). Stated another way, for a municipal entity to be liable for a violation of § 1983, a plaintiff must show: (1) a deprivation of a constitutional right; and (2) that the municipal entity is responsible for that deprivation. *Doe v. Claiborne Cty.,* 103 F.3d 495, 505–06 (6th Cir. 1996).

Therefore, "[l]iability may be imposed on a county only when a county 'policy' or 'custom' caused the plaintiff's injury and a 'direct causal link' existed between the policy and the purported denial of the right to adequate medical care." *Jones v. Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010). To show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015).

At base, Plaintiff fails to point to admissible evidence creating a factual issue regarding this claim. Defendants point to Sheriff Sigsworth's testimony that he does not have a policy prohibiting inmates from receiving benzodiazepines or opiates. *See* Sigsworth Depo., at 33 ("The policy would be to have that medical issue reviewed by the medical staff and the medical staff would make any appropriate decisions based on their belief as to what medication the inmate should receive."). They further point to jail policy expert Sean Stewart's testimony that "it was a responsible and sound jail policy to delegate the obligation and authority for diagnosing, treating and otherwise providing medical/mental health care for inmates at the jail to medical and mental health professionals[]". (Doc. 125-6, at 5). It is not "unconstitutional for municipalities and their

20

employees to rely on medical judgments made by medical professionals responsible for prisoner care." *Est. of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004) (internal quotation and citation omitted). *Graham* explained:

> Even if, as Graham contends, the policy required jail personnel to defer to the medical decisions of SecureCare employees, and even if it permitted licensed practical nurses to make medical decisions that Michigan law does not permit them to make, those alleged defects are insufficient to hold the County liable for the alleged constitutional violation in this case. It is possible that Mr. Graham received medical care that fell below the applicable standard of care under Michigan law. It is even possible that the medical care that he received was so woefully inadequate as to rise to the level of a constitutional violation. But even assuming that Graham did suffer a constitutional violation, that violation "resulted from factors other than a faulty [County policy]." *City of Canton v. Harris*, 489 U.S. 378, 390–91 . . . (1989) (citations omitted).

*Id.* at 384–85; *see also Medley v. Shelby Cty.*, 742 F. App'x 958, 962 (6th Cir. 2018) ("a County 'may constitutionally contract with a private medical company to provide healthcare services to inmates'" . . . [a]nd Medley offers no evidence that outsourcing inmate medical care to Southern raises "an obvious risk to inmates' constitutional rights to adequate medical care.") (quoting *Winkler v. Madison Cty.*, 893 F.3d 877, 902 (6th Cir. 2018)).

Plaintiff seemingly attempts to argue that Sigsworth / the County were on notice that Health District policies were constitutionally inadequate.[8] He does so by pointing to two Affidavits – one from David Smith and one from Billy Whyde regarding their own experiences at the Erie County Jail. *See* Docs. 138-3, at 1, 137-8. Both contain information regarding being housed at the Erie County jail in 2017 and treatment by (mostly) unnamed correctional officers and medical providers. The County Defendants object to their consideration, arguing they are irrelevant, contain hearsay, and contain medical opinions that neither is qualified to offer. The Court agrees with Defendants, and further – to the extent Plaintiff attempts to use this evidence

---

8. Plaintiff also cites and submits inadmissible and/or irrelevant evidence regarding incidents at other jail facilities.

to prove notice of constitutionally inadequate policies – finds that even taken at face value, it does not do so.

Plaintiff thus has not identified "a county 'policy' or 'custom' caused [his] injury and a 'direct causal link' existed between the policy and the purported denial of the right to adequate medical care." *Jones*, 625 F.3d at 946. As such, the County Defendants are entitled to summary judgment on Plaintiff's deliberate indifference *Monell* claim.

### Nurse Cromwell

The Health Defendants contend Nurse Cromwell is entitled to summary judgment. Plaintiff presents no argument in opposition, mentioning Nurse Cromwell only in a footnote. *See* Doc. 137, at 25 n.3. As with Plaintiff's claims against Lt. Proy, the Court finds Plaintiff waived this claim by failing to respond to Defendants' arguments. *See Palma*, 2022 WL 594046, at *6 n.1; *Brown*, 545 F. App'x at 372. Furthermore, Plaintiff has simply presented no evidence to demonstrate Nurse Cromwell recklessly failed to act reasonably to mitigate a serious risk of harm to Plaintiff or that her actions violated any clearly established law. She is therefore entitled to summary judgment.

### Nurse Burgess

Plaintiff asserts Nurse Burgess was deliberately indifferent to his medical needs in two ways: first, in failing to inform Dr. Eldridge of the Xanax prescription, and second, in failing to take any additional action as Plaintiff "declined" during his time in the jail.

As to the first contention, Plaintiff testified he told Nurse Burgess he was taking Xanax, among other medications, and he gave her the names of several pharmacies. On the health appraisal form, Nurse Burgess documented Plaintiff's medications as Opana, Oxycodone, Neurontin, and Trileptal. (Doc. 117-2, at 1). She further documented Plaintiff's pharmacy as

Wal-Mart Fremont, and his treating physician as Dr. Schotterer. *Id.* Nurse Burgess did not recall Plaintiff telling her about a Xanax prescription or additional pharmacies, and testified that if he had, she would have documented it on the form. (Burgess Depo., at 68-69). She contacted Wal-Mart Fremont and verified prescriptions for Opana, Neurontin, and Trileptal. *See id.* at 43-44, 68-70; Doc. 117-3. Thereafter, Nurse Burgess contacted Dr. Eldridge for a medication order; she did not tell Dr. Eldridge Plaintiff was taking Xanax. (Burgess Depo., at 70); Doc. 117-3.

For purposes of this motion, the Court must take as true Plaintiff's version. However, even so doing, the Court cannot find Plaintiff has presented evidence that Nurse Burgess's inaction rises above the level of "[m]ere negligence". *Brawner*, 14 F.4th at 596. In the light most favorable to Plaintiff, he told Nurse Burgess of his Xanax prescription. Despite her recording numerous medications Plaintiff advised he was taking, there is no evidence Nurse Burgess ever appreciated or recorded on the health appraisal form the fact that Plaintiff told her he was presently taking Xanax.[9] In the absence of such appreciation, there would have been no reason to contact additional pharmacies to seek out further evidence of additional prescriptions, particularly given that Nurse Burgess was able to confirm the majority of the listed medications.[10]

---

9. Nor does the correctional officer's intake screening form indicate Xanax is necessarily a current prescription or that Plaintiff was withdrawing from it. *See* Doc. 117-1 (stating, in response to a question about "Current And/Or Past Mental Health Problems": "Yes[.] Narotin, Tripolta, Xanex, Symbolta [sic]"; and elsewhere stating "withdraw[a]l opanes, oxyforfom, oxycodone [sic]").

10. The record reflects Nurse Burgess confirmed valid prescriptions with Wal-Mart Fremont for three of Plaintiff's four prescriptions she documented; it appears Wal-Mart Fremont did not confirm a prescription for Oxycodone. *Compare* Doc. 117-2, at 1 *with* Doc. 117-3. Notably, Plaintiff has not argued Nurse Burgess was deliberately indifferent in any way with respect to the Oxycodone prescription Moreover, both Oxycodone and Opana are opioid medications and Dr. Eldridge testified his treatment recommendation for someone on Plaintiff's dosages of these

Ideally, and perhaps even as a matter of complying with the applicable standard of care, Nurse Burgess should have appreciated and documented Plaintiff's use of Xanax. But in light of everything she did document, seek to confirm, and relay to Dr. Eldridge, it is not reasonable to infer that her failure to document the Xanax prescription rises beyond the level of a mistake or "mere negligence." *Brawner*, 14 F.4th at 596. Plaintiff has not presented evidence from which a reasonable jury could find that Nurse Burgess's "action (or lack of action) was intentional (not accidental) and she either (a) acted intentionally to ignore [the detainee's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to" the detainee. *Id.* at 597.[11]

As to Plaintiff's second contention – that Nurse Burgess was deliberately indifferent by failing to take additional action based on Plaintiff's continued symptoms – the Court similarly finds Burgess entitled to summary judgment.

When Plaintiff's changed behavior and complaints were brought to Burgess's attention by Officer Beatty, Nurse Burgess responded by taking his vital signs. She noted that Plaintiff had – that day – refused both his morning and afternoon withdrawal medications seemingly attributing his slightly elevated vital signs to that. And Dr. Eldridge testified it would be reasonable for a nurse to so conclude. (Eldridge Depo., at 92). Recently, in a post-*Brawner* and

medications would be the prescribed Clonidine protocol; this is the protocol he prescribed Plaintiff. (Eldridge Depo., at 73-76, 84-85).

11. This case differs from *Brawner*, where the Sixth Circuit found a reasonable jury could have found a jail nurse acted recklessly where plaintiff suffered seizures after prescribed medication was withheld at the jail where the nurse (1) should have seen a form listing four medications, *and* (2) there was evidence the nurse became aware plaintiff suffered from seizures after being discharged from the hospital, *and* (3) social worker informed the nurse that the plaintiff's symptoms were most likely the result of drug withdrawal. 14 F.4th at 598. The facts presented here, by contrast, show that at most Nurse Burgess negligently failed to document and therefore follow-up on being informed about a Xanax prescription and did not later recognize that Plaintiff's symptoms might be caused by something other than opiate withdrawal, if they were.

*Greene* decision, the Sixth Circuit upheld the grant of qualified immunity to a nurse who allegedly failed to provide additional care where "it [was] undisputed that the symptoms" the nurse observed "were consistent with heroin withdrawal." *Britt v. Hamilton Cty.*, 2022 WL 405847, at *3 (6th Cir.). Here, Nurse Burgess knew Plaintiff was on an opiate withdrawal protocol and Plaintiff points to no facts distinguishing opiate withdrawal symptoms from benzodiazepine withdrawal symptoms. As the Court explained in *Britt*: "[the nurse's] care could have risen to deliberate indifference only if Britt's 'symptoms had been clearly inconsistent with [heroin] withdrawal' and she had failed 'to confirm that his symptoms were not indicative of a different and more serious condition.'" 2022 WL 405847, at *3 (quoting *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014)).

None of this is to say that the Court specifically condones Nurse Burgess's actions, or that such actions conformed in their entirety with the applicable standard of care, or were not negligent. But the Court's task in a case such as this one is to evaluate whether her conduct violated the Constitution, and the Court finds Plaintiff has not created a genuine issue of material fact about whether it rises to that level. As such, Nurse Burgess is entitled to qualified immunity and summary judgment.

### Dr. Eldridge

Defendants further contend Dr. Eldridge is entitled to summary judgment. In opposition, Plaintiff challenges Dr. Eldridge's actions in prescribing an opiate withdrawal protocol without reviewing Plaintiff's medical records or examining him as deliberately indifferent. *See* Doc. 137, at 42 ("Eldridge acted with deliberate indifference to Mr. Whyde's serious medical needs by abruptly cutting him off all of his high-dose pain medications without independently evaluating

him, reviewing any of his medical records and failing to check on him even once while he decompensated over a 5-day period in the Erie County Jail.").

Dr. Eldridge only had the information relayed to him by Nurse Burgess. That is, Dr. Eldridge only knew Plaintiff was taking Opana, Neurontin, and Trileptal, and ordered an opiate detoxification protocol in response. As Plaintiff acknowledges in opposition, "Dr. Eldridge did not know about Mr. Whyde's Xanax prescription." (Doc. 137, at 30). As to any claim regarding Xanax, therefore, Dr. Eldridge cannot have been deliberately indifferent to a condition of which he was not aware.

As to Plaintiff's argument that Dr. Eldridge acted with deliberate indifference by ordering an opiate withdrawal protocol rather than continuing Plaintiff's medications, Defendants again assert qualified immunity. *See* Doc. 144, at 22 ("More importantly, [the use of withdrawal protocols] has not been deemed unconstitutional by clearly established law."). Here, it is true that Dr. Eldridge ordered Plaintiff on an opiate withdrawal protocol rather than give him his prescribed medication. But, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sounds in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).

And, in response (and in his supplemental briefing), Plaintiff does not present clearly established caselaw to the contrary. That is, he has not presented evidence that "at the time of [Dr. Eldridge's] conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing" – prescribing an opiate withdrawal protocol rather than continuing Plaintiff's prescriptions – "is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotation

26

and citation omitted). He has not "identif[ied] a case that put [Dr. Eldridge] on notice that [his] specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8.

So too is Dr. Eldridge entitled to summary judgment on Plaintiff's contention that Dr. Eldridge acted with deliberate indifference by not examining Plaintiff or his medical records and "failing to check on him even once while he decompensated over a 5-day period in the Erie County Jail". (Doc. 137, at 42). First, Plaintiff points to no evidence that Dr. Eldridge had any awareness of Plaintiff's ongoing condition beyond the initial conversation with Nurse Burgess. Second, he has not shown Dr. Eldridge's "action (or lack of action) was intentional (not accidental) and he either (a) acted intentionally to ignore [the detainee's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to" the detainee. *Brawner*, 14 F.4th at 597. Third, and most importantly, Plaintiff has again not presented evidence that "at the time of [Dr. Eldridge's] conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589. He has not "identif[ied] a case that put [Dr. Eldridge] on notice that [his] specific conduct", prescribing medication without physically examining Plaintiff or his records, "was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8; *see also Graham*, 358 F.3d at 385 ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law."). This is not to say such action is a best medical practice, but Plaintiff has not established it is clearly unconstitutional.

*Monell* Claim Against Health Defendants

Plaintiff also asserts a *Monell* deliberate indifference claim against the Health Defendants. He contends the Health District's policy prohibiting opioids and benzodiazepines in

the jail was the cause of his injuries, citing the Health Defendants' admission that they had such a policy. First, as above, Plaintiff has not established that a policy for providing an opiate withdrawal protocol rather than prescribed opiates violates the Constitution.

Second, s to the jail policy regarding benzodiazepines, Plaintiff points to the Health Defendants admission that they had such a policy in place during Plaintiff's time at the Erie County Jail. *See* Doc. 137-6 (admitting that "the Health District had a policy in place from May [sic] 27, 2017 until April 2, 2017 prohibiting any inmate of the Erie County Jail from receiving any benzodiazepine prescription medication while housed in the facility"). The Health Defendants respond that they "did not have such blanket policies" and "[i]n fact, the benzodiazepine withdraw protocol provides for the distribution of Clonazepam (a benzodiazepine) so that there is no 'cold turkey' cessation of such medications." (Doc. 144, at 24); *see also* Burgess Depo., at 39-40 (discussing Clonazepam as part of the benzodiazepine withdrawal protocol); Eldridge Depo., at 19-21, 43 (same) At first blush, these two things seem inconsistent – a policy prohibiting benzodiazepines, and a protocol permitting them. But the Court finds they are not so. That is, the jail could have a policy of not permitting ongoing prescription benzodiazepine medication, but permit a benzodiazepine in weaning doses as part of a withdrawal protocol.

Thus, the Court finds Plaintiff has not created a genuine issue of material fact that a Health Defendant policy was the "moving force" behind any constitutional violation because he cannot show a "direct causal link" between the policy and his injury. *See Jones*, 625 F.3d at 946. Here, Plaintiff did not receive any treatment related to his Xanax prescription not because of a Health Defendant policy, but rather because no information about Xanax was ever

communicated to Dr. Eldridge. This distinguishes the case from *Brawner* where there was an undisputed "blanket ban on controlled substances":

> [H]ere there was plenty of time for Brawner to receive her prescribed medications or alternative medications in the eight days between when she first arrived at the jail and when she suffered her first seizure, or in the seven days after that seizure before she suffered the series of seizures that resulted in her severe injuries. Thus, a reasonable jury could find that Nurse Massengale's failure to treat Brawner appropriately was due to the County's application of the no-narcotics policy, which caused Brawner's injuries.

14 F.4th at 599-600. By contrast here, Dr. Eldridge testified that Plaintiff was not treated according to the benzodiazepine withdrawal protocol "because we didn't know he was on Benzo's". (Eldridge Depo., at 43). This – rather than any Health Defendant policy – was the "moving force" behind any injury here caused by Xanax withdrawal.

As such, the Court finds the Health Defendants are also entitled to summary judgment on Plaintiff's deliberate indifference *Monell* claim.

<u>Excessive Force</u>

The Court next turns to Plaintiff's excessive force claims. As is relevant here, Plaintiff's cause of action is brought against "Erie County, Sigsworth, Hamernik, Kerr, Barrett, Salyers, [and] Paytosh". (Doc. 74, at 25).[12] In response, the individual County Defendants assert entitlement to qualified immunity, contending Plaintiff cannot create a genuine issue of material fact about either prong. They further assert the *Monell* claim against Sigsworth fails because: (1) Plaintiff has demonstrated no constitutional violation, and (2) Plaintiff has not established the Erie County Sheriff's Office has a policy, practice, or custom of excessive force.

At the outset, the Court reiterates that on summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*,

---

12. The first cause of action is also brought against two other Defendants (Orzech and Bunting), but this claim relates to the 2019 events, not the 2017 events.

477 U.S. at 255. Even so, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "[W]here, as here, there is 'a videotape capturing the events in question,' the court must 'view[ ] th[ose] facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (second alteration in *Green*) (quoting *Scott*, 550 U.S. at 378–81). However, where the video does not tell the whole story in a material respect, or "reasonable jurors could interpret the video evidence differently," summary judgment is not appropriate. *Id.* at 865.

Pretrial detainees are protected from the use of excessive force by the Fourteenth Amendment. *Phelps v. Coy*, 286 F.3d 295, 300 (6th Cir. 2002). To prevail on such a claim, a pretrial detainee must show "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). In determining the reasonableness or unreasonableness of the force used, courts consider factors such as "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 397. "An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (per curiam) (citing *Hudson*, 503 U.S. at 9).

The Complaint identifies several sequential actions it contends amount to excessive force. The Court evaluates to each in turn. *See Hanson v. Madison Cty. Detention Ctr.*, 736 F. App'x

521, 529 (6th Cir. 2018) (in a case involving multiple uses of force, the court must assess the reasonableness of each use of force "in chronological 'segments.'") (quoting *Dickerson v. McClennan*, 101 F.3d 1151, 1162 (6th Cir. 1996)). "This approach requires [a reviewing court] to evaluate the use of force by focusing "on the 'split-second judgment' made immediately before the officer used allegedly excessive force," not on the poor planning or bad tactics that might have 'created the circumstances' that led to the use of force." *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019) (quoting *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007)); *see also Rucinski v. County of Oakland*, 655 F. App'x 338, 342 (6th Cir. 2016) ("[W]e are required to . . . focus[ ] on the moments immediately preceding th[e] use of force[.]").

And to repeat, because Defendants have asserted qualified immunity, it is Plaintiff's burden to demonstrate the right violated was clearly established at the time of each individual Defendant's alleged misconduct. *See T.S.*, 742 F.3d at 635.

Sorting the wheat (Plaintiff's arguments supported by admissible evidence) from the chaff (the inadmissible evidence and unsupported argumentation) is no simple task in the instant case. Moreover, as the County Defendants point out, both Plaintiff's Complaint and opposition brief frequently address "Defendants" actions collectively, rather than individually. But it is Plaintiff's burden to produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial.". *Pineda*, 977 F.3d at 491; *see also Peterson v. Heymes*, 931 F.3d 546, 555 (6th Cir. 2019) ("We analyze qualified immunity separately for each defendant."). The Court therefore looks at each Officer's actions individually.

31

Officer Kerr

Plaintiff contends Officer Kerr used excessive force by: (1) taking him down, and (2) punching him during the cell extraction.

*Takedown*

At issue first is Officer Kerr's takedown in Plaintiff's cell. Plaintiff contends this was excessive force, seemingly asserting he was providing only passive, rather than active, resistance. *See* Doc. 138, at 36-38. Plaintiff is correct that the Sixth Circuit has distinguished between active and passive resistance, but the Court finds he has not pointed to cases demonstrating – as applied to the facts viewed in the light most favorable to Plaintiff here – that "at the time of [Kerr's] conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (quoting *al-Kidd*, 563 U.S. at 735) (internal quotations omitted)).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "Active resistance to an officer's command can legitimize" higher levels of force, such as "an officer's use of a Taser." *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) (citing *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012)). "Such resistance can take the form of 'verbal hostility' *or* 'a deliberate act of defiance.'" *Id.* (emphasis added) (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534–35 (6th Cir. 2013)); *see also Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 612 (6th Cir. 2020) ("This Court has identified active resistance where some outward manifestation — either verbal

or physical — on the part of the suspect had suggested volitional and conscious defiance.") (citations and quotations omitted).

Defendants point to *Scott v. Kent County*, 679 F. App'x 435 (6th Cir. 2017). There, the Sixth Circuit affirmed the district court's grant of qualified immunity where "[w]hile [the plaintiff] was being removed from a cell for disruptive conduct, he stepped toward [the officer] in close quarters, unhandcuffed and with clenched fists." *Id.* at 441. The Sixth Circuit distinguished the single case cited by Plaintiff and explained that it had "not found other Supreme Court or Circuit precedent that would have put [the officer] on notice that his takedown was an excessive use of force in this situation." *Id.*

In opposition, Plaintiff cites Sixth Circuit cases describing the general principle that mere noncompliance is not active resistance, and thus does not justify a use of force. *See* Doc. 138, at 37 (citing *Woodcock v. City of Bowling Green*, 679 F. App'x 419 (6th Cir. 2017); *Goodwin v. City of Painsville*, 781 F.3d 314, 323-24 (6th Cir. 2015); *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013); *Jackson v. Washtenaw County*, 678 F. App'x 302, 306 (6th Cir. 2017); and *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015)). But Plaintiff makes no effort to analogize the facts of these cases to those at issue here or explain how they would put a reasonable officer in Kerr's position on notice that his decision to initiate a takedown was unlawful. Upon review, the Court finds none of these cases contain similar facts to this one.

In *Woodcock*, the Sixth Circuit found unreasonable the use of deadly force where the suspect was 72 feet away from officers, did not attack or threaten anyone during a twelve minute encounter with police, was stumbling and had slurred speech, and was not facing officers when officers fired. 679 F. App'x at 423-24.

33

In *Goodwin*, the Sixth Circuit found that a suspect's simple refusal to comply with an officer's command to step outside his apartment was not active resistance sufficient to justify use of a taser. 781 F.3d at 323-24.

In *Eldridge*, a suspect was pulled over on suspicion of driving under the influence. 533 F. App'x at 532. An officer approached the truck and turned it off; the suspect "was not threatening either verbally or physically, as demonstrated by his polite responses to the officers' questions about his physical incapacity to move from his stationary vehicle." *Id.* The Sixth Circuit held that Plaintiff's failure to comply with officers' repeated demands to get out of the car was not active resistance in that "a reasonable officer faced with the same circumstances could not have determined that Eldridge's actions bore the hallmarks of active resistance". *Id.* at 533.

In *Jackson*, the Court again described the distinction between active and passive resistance. 678 F. App'x at 306 ("We have long distinguished active resistance by arrestees from passive resistance. The former can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders. The latter is generally shown by the lack of physical resistance or verbal antagonism.") (internal citations omitted). But factually, *Jackson* involved a suspect who was tased four times and the Sixth Circuit found no error in the district court's grant of qualified immunity as there was "no genuine issue of material fact that the actions taken by Defendants were reasonable responses to the resistance (real or perceived) made by Jackson." *Id.* at 309.

Finally, in *Rudlaff*, the Sixth Circuit *reversed* the district court's denial of qualified immunity because it found it was not clearly established that the single use of a taser and a knee shot in response to a suspect who admitted he tried to prevent the officer from handcuffing him. 791 F.3d at 643 ("[T]he law says that when someone resists arrest, the police may

constitutionally use force to ensure their compliance. A jury has nothing left to decide. Because the officers acted constitutionally—and because even if they didn't, by all accounts they didn't *clearly* act unconstitutionally—they are protected by qualified immunity.").

The cited cases all involve different uses of force than a physical takedown (tasers and a shooting), and none involve a prison setting. Here, even taking the facts in the light most favorable to Plaintiff, the Court finds "a reasonable officer faced with the same circumstances" as Officer Kerr could "have determined that [Plaintiff's] actions bore the hallmarks of active resistance." *Eldridge*, 533 F. App'x at 533.

The Sixth Circuit has "identified active resistance where some outward manifestation — either verbal or physical — on the part of the suspect had suggested volitional and conscious defiance." *Kapuscinski*, 821 F. App'x at 612 (citations and quotation omitted). Here, prior to the cell entry, while Kerr was present, Hamernik asked Plaintiff six times to "back up and cuff up", and he did not comply. Hamernik subsequently asked Plaintiff to lie down, and he did not. Kerr then entered the cell first, telling Plaintiff twice to turn around. Plaintiff did not turn around and said something undiscernible while facing Kerr. A reasonable officer in Kerr's position, could have interpreted this as a verbal manifestation of "volitional and conscious defiance", *Kapuscinski*, 821 F. App'x at 612, or "verbal hostility", *Eldridge*, 533 F. App'x at 535, rising to the level of active resistance, particularly given Plaintiff's refusal to comply with prior requests to present his hands for handcuffing or to lie down immediately before officers entered his cell. Although *Scott*, cited by Defendants, involves a different type of active resistance than the instant case (the inmate "stepped toward [the officer] in close quarters, unhandcuffed and with clenched fists", 679 F. App'x at 441), it more generally involved active resistance in the context

35

of a cell extraction and officers' use of a takedown maneuver. The Sixth Circuit found the officers entitled to qualified immunity there, and the Court here finds the same.

Further, and significantly, none of the cases identified by Plaintiff involve a prison setting. Although Plaintiff was a pretrial detainee, the Supreme Court in *Kingsley* recognized that in the totality of the circumstances analysis, the Court must "account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security." *Kingsley*, 135 S. Ct. at 2468 (quoting *Bell v. Wolfish*, 99 S. Ct. 1861 (1979)); *see also Hanson*, 736 F. App'x at 531-32 ("At some point, in response to defiance and belligerence, officers are entitled to "preserve internal order and discipline.") (quoting *Bell*, 441 U.S. at 547).

Plaintiff has thus not "identif[ied] a case that put [Kerr] on notice that [his] specific conduct was unlawful"; each of the cases Plaintiff does cite (above) is "materially distinguishable". *Rivas-Villegas*, 142 S. Ct. at 8. As such, Kerr is entitled to qualified immunity for the takedown.

*Punch*

Next, Plaintiff contends Officer Kerr punched him during the cell extraction. (Doc. 138, at 15). Defendants assert the video disproves these allegations and Plaintiff admitted his testimony on this point was based not upon memory, but upon his viewing of the video. However, the Court need not determine whether the video contradicts or confirms Plaintiff's allegations because even taking Plaintiff's version as true, Kerr is entitled to qualified immunity. At the time Plaintiff asserts Kerr punched him, Plaintiff was – by his own admission – and as the video depicts – actively resisting officers' attempts to gain control and place him in handcuffs.

36

Such an action in these circumstances is not a constitutional violation. *See Brax v. City of Grand Rapids*, 742 F. App'x 952, 957 (6th Cir. 2008) (finding an officer's "split-second judgment that a single punch was necessary to subdue a drunk, strong, and resisting young [suspect]" not unreasonable and thus not violative of the Fourth Amendment); *Jones v. Lee*, 2012 WL 683362, at *5 (E.D. Mich.) ("[D]efendant Lee's alleged punch which caused nothing more than a bruise constitutes a *de minimis* use of force."); *see also Moher v. United States*, 875 F. Supp. 2d 739, 758 (W.D. Mich. 2012) ("Generally, a single isolated push, shove, punch, or blow by a prison guard or police officer using *de minimis* force does not rise to the level of a violation of the United States Constitution."); *Brady v. City of Westland*, 1 F. Supp. 3d 729, 739 (E.D. Mich. 2014) (finding officer's single punch "in the side with a closed fist in an effort to prevent Mr. Murray from kicking the officers and to overcome Mr. Murray's resistance to playing his arms behind his back for handcuffing" was not excessive force).

Moreover, Plaintiff has not satisfied his burden to identify clearly established law that would inform a reasonable officer in Kerr's position that a punch in these factual circumstances constitutes excessive force. As such, Kerr is entitled to qualified immunity on this claim.

<u>Officer Salyers</u>

Defendants next contend Salyers is entitled to summary judgment on Plaintiff's claim that Salyers used excessive force when he stepped on Plaintiff's leg (or shackles) during the cell extraction. *See* Doc. 75, at ¶ 69. Defendants assert the evidence demonstrates this action was accidental and incidental to reasonable efforts to restrain a physically-resisting inmate. They further contend Plaintiff has not pointed to any evidence that he suffered an injury as a result of this action. Although Plaintiff's opposition brief mentions this action (Doc. 138, at 16, 40), the only evidence he cites in support is: (1) Salyers's deposition testimony that he accidentally

applied pressure to Plaintiff's shackled leg, *see* Doc. 138, at 16 ("Defendant Salyers stood on Mr. Whyde's already injured left ankle and leg while it was shacked, causing him to scream in pain.") (citing Salyers Depo, at 48); Doc. 138, at 40 (summarizing Salyers's deposition testimony about applying pressure to Plaintiff's leg/shackle) (citing Salyers Depo, at 20, 24); and (2) Plaintiff's post-deposition Affidavit[13] that states "[a]nother Correctional Officer stood on my injured left ankle and leg while it was shackled, causing me to scream in agony" (Doc. 137-1, at 2).[14] And Plaintiff does not explicitly respond to Defendants' legal argument that Salyers is entitled to qualified immunity and summary judgment.

Once on the floor, the video depicts the officers seeking to gain control of Plaintiff. Plaintiff admitted he was resisting officers' efforts at this point. As the Sixth Circuit has said, "whatever had led up to the takedown, the officers were faced with a suspect who was actively resisting, and they had to do something about it." *Jennings v. Fuller*, 659 F. App'x 867, 871 (6th Cir. 2016). Moreover, this all unfolded in the small, cramped quarters of a jail cell.

Plaintiff cites no evidence from which a jury could conclude Salyers acted intentionally, rather than accidentally. *See Kingsley*, 576 U.S. at 396. Salyers testified that he put his foot on Plaintiff's leg shackles accidentally, and when he realized it had happened, he removed it. (Salyers Depo, Doc. 116, at 24-27, 48, 53-55). Further, even if Plaintiff had presented evidence that Salyers acted intentionally – as with Officer Kerr and the punch – he has pointed to no clearly established law that would inform a reasonable officer in Salyers' position that doing so in these factual circumstances constitutes excessive force. As such, Plaintiff has not carried his

---

13. The County Defendants' challenge the admissibility of this Affidavit on the basis that it is not based on personal knowledge (due to Plaintiff's altered mental state at the time of the events at issue). (Doc. 145, at 10-11). But the Court need not resolve this challenge on this basis because even considering the Affidavit, Plaintiff cannot succeed on this claim.

14. Plaintiff also cites the Affidavit of Kevin Lackner on this point (Doc. 138-6), but that Affidavit is both irrelevant and hearsay as applied to the claim against Officer Salyers.

burden to overcome Salyers' assertion of qualified immunity and Salyers is entitled to summary judgment on this claim.

<u>Hamernik</u>

Plaintiff next asserts the use of the restraint chair amounts to excessive force. (Doc. 74, at ¶¶ 71-72, 89-90). He asserts the decision to use the chair was "[a]t the direction of Sgt. Hamernik." *Id.* at ¶ 71. Defendants move for summary judgment, arguing Plaintiff has not "pinpointed any particular conduct by any specific officer related to use of the restraint chair which he contends is wrongful", and that even if he had, such a claim would fail. (Doc. 125-1, at 45-48). In response, Plaintiff seemingly asserts the following arguments regarding the restraint chair: (1) Hamernik "chose to create a disturbance to justify the excessive use of force and placing Mr. Whyde in a restraint chair", by placing the chair in front of the cell (Doc. 138, at 14); (2) the chair was improperly used as punishment; and (3) Plaintiff was confined to the chair for over six hours "without receiving any medical treatment" (Doc. 138, at 17).

*"Cause of the Disturbance" / Alternative Actions*

Plaintiff seemingly argues Hamernik placed the restraint chair in front of the cell to provoke Plaintiff, thus justifying the use of force, and subsequent use of the chair as "punishment". He further contends Hamernik knew Plaintiff was suffering from withdrawal symptoms and thus should have recognized Plaintiff needed medical attention and responded differently.[15]

In part, Plaintiff's argument appears to be officers never should have entered his cell, but should have taken some different action. That is, they created the situation that led to any need

---

15. To the extent Plaintiff attempts to argue a deliberate indifference to medical needs claim against Hamernik, the Court finds he did not plead such a claim. *See* Doc. 74, at 28 (asserting deliberate indifference claim against other Defendants, but not Hamernik).

for force to be used and thus the force was unconstitutional. But for this argument to succeed and overcome the asserted qualified immunity, Plaintiff would need to point to clearly established law that establishes such a proposition, and he has not done so. And the Sixth Circuit has explained that it is the situation in the moment that matters, not what came prior. *See Rucinski*, 655 F. App'x at 342 ("[W]e are required to . . . focus[ ] on the moments immediately preceding th[e] use of force[.]"); *see also Reich*, 945 F.3d at 978 (a court is required "to evaluate the use of force by focusing "on the 'split-second judgment' made immediately before the officer used allegedly excessive force," not on the poor planning or bad tactics that might have 'created the circumstances' that led to the use of force.") (quoting *Livermore ex rel. Rohm*, 476 F.3d at 406)). Further, as the Sixth Circuit has explained in the Fourth Amendment use-of-force context: "The Fourth Amendment . . . does not require police officers to take the better approach. It requires only that they take a reasonable approach." *Cook v. Bastin*, 590 F. App'x 523, 528 (6th Cir. 2014).[16]

The undisputed evidence demonstrates at the time Plaintiff was placed in the restraint chair, he was actively (and strongly) resisting the officers – not subdued or cooperative. He has not created an issue of material fact about a claim that the act of placing him in the chair constituted excessive force.[17]

---

16. "[U]nder the Fourth or Fourteenth Amendments . . . we inquire whether the plaintiff has shown that the 'force purposely or knowingly used against him was objectively unreasonable." *Hopper v. Plummer*, 887 F.3d 744, 752 (6th Cir. 2018) (quoting *Kingsley*, 135 S. Ct. at 2473)); *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015) (noting that the test "under either amendment," requires the court to "employ the same objective test for excessive force"). Thus, the distinction between the Fourth and Fourteenth Amendment standard in the context of pretrial detention is "purely academic." *Clay*, 797 F.3d at 369.

17. Plaintiff further argues that Hamernik acted inconsistently with the Jail's internal discipline policy. But "the violation of city policy is not in and of itself a constitutional violation under 42 U.S.C. § 1983." *Bradley v. City of Ferndale*, 148 F. App'x 499, 508 (6th Cir. 2005) (citing *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)).

*Use of the Chair as Punishment*

Next, Plaintiff contends the chair was used as impermissible punishment. This argument is largely premised on the assumption that Hamernik or others knew or should have known that Plaintiff's behavior was a result of withdrawal and thus should have taken some alternative action. Such a claim does not state a claim for excessive force, and, as set forth above, what matters is the actions in the moments immediately preceding the force, not earlier decisions.

Further, the evidence is that prior to the cell removal, Plaintiff "was repeatedly pounding on the cell door and windows with his hands" and as a result, Hamernik decided to remove him from the cell and place him in the restraint chair "[t]o prevent him from causing any harm to himself and striking that cell door and window repeatedly." (Hamernik Depo., Doc. 112, at 126); *see also* Salyers Depo., Doc. 116, at 10-13; Paytosh Aff., Doc. 125-2, at ¶ 7; Barrett Aff. Doc. 125-3, at ¶ 7. Plaintiff admits he "began banging on his cell door and windows and slamming his food tray around" and continued despite officers' requests for him to stop. (Doc. 74, at ¶ 61).

As to placement in the restraint chair, the video shows Plaintiff actively resisting removal from his cell and the officers struggling to control him. He was neither subdued nor cooperative when placed in the chair. A restraint chair may be properly used to restore control over an individual who is in custody or to prevent such an individual from harming himself." *Fletcher v. Vandyne*, 2009 WL 1687956, at *14 (S.D. Ohio) (citing, *inter alia*, *Fuentes v. Wagner*, 206 F.3d 335 (3d Cir. 2000)); *see also Jennings*, 659 F. App'x at 871 ("pepper spray, Tasers, arm bars, restraint devices, spit hoods, etc. all have their legitimate place.").

And *Berishaj v. City of Warren*, 2006 WL 2069440 (E.D. Mich.), cited by Plaintiff, does not dictate a different result here. That case is not analogous, even by Plaintiff's own description thereof: "Judge Roberts . . . held that *when the inmate[] denies being unruly or disruptive*, jurors

could find that . . . the restraint chair . . . [was] not rationally related to a legitimate, nonpunitive government purpose[.]") (Doc. 138, at 24) (emphasis added). Plaintiff here *admits* being disruptive. *Berishaj* also relied upon the standard set forth in *Fuentes*. In *Fuentes*, the Third Circuit explained that "[r]estraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting". 206 F.3d at 342 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). As *Bell* set forth:

> [We] must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

441 U.S. at 538–39.

Here, although Plaintiff insists the chair was used as punishment, he points to no evidence to create an issue of fact about such a claim. The admissible evidence demonstrates Hamernik ordered the restraint chair because he was concerned about self-harm. (Hamernik Depo., at 52, 54, 65, 112). Jail expert Stewart opined that this decision was "consistent with standard, appropriate and recognized jail administrative practices." (Doc. 125-6, at 2).[18] Further,

---

18. Stewart further opined:

> It is my opinion that jail staff took the appropriate course of action when determining to intervene. Had they undertaken the alternative course of ignoring Whyde's actions, failing to intervene, and failing to restrain Whyde, they would have placed Whyde at an unacceptable risk of self-harm. That alternative course

by the time Plaintiff was placed in the chair, he was actively resisting the officers' efforts and agitated. Again, to the extent Plaintiff focuses alleged "poor planning or bad tactics that might have 'created the circumstances' that led to the use of force", *Reich*, 945 F.3d at 978, this is not the relevant inquiry.

Plaintiff has not pointed to evidence creating a genuine issue of material fact regarding whether the chair was used for punishment (or was "arbitrary or purposeless"), rather than "reasonably related to a legitimate governmental objective." *Bell*, 441 U.S. at 538. Nor has he pointed to any clearly established law that would put any Defendant on notice that use of a restraint chair in these factual circumstances was unconstitutional.

*Length of Time in Chair*

Defendants further move for summary judgment on any claim that the length of time Plaintiff was confined to the chair violated clearly established law. In opposition, Plaintiff asserts that he was "confined to the restraint chair continuously for over six (6) hours without receiving any medical treatment." (Doc. 138, at 17). But he presents no specific legal argument to demonstrate Defendants' actions violated any clearly established law.

In his deposition, Plaintiff acknowledged "[t]he mental health lady" or counselor came to check on him when he was in the chair. (Plaintiff Depo., at 161). He said she was only with him for ten seconds. *Id.* at 165-67. He did not recall anyone in the jail checking on him, but it was possible they did; he denied anyone could have checked on him every ten minutes. *Id.* at 163. During his time in the restraint chair, Plaintiff was "in and out", sometimes awake and sometimes asleep. *Id.* at 169. Defendants submit logs purporting to show checks on Plaintiff in

---

would have been inconsistent with their duty to protect his safety, and their duty to maintain order and discipline in the facility.
(Doc. 125-6, at 2).

intervals of ten minutes or less. (Doc. 115-6, at 1-4). These logs, and officers' testimony show Plaintiff continued to appear unstable and combative while in the chair. *See* Doc. 117-4 (observation notations including "thrashing", "yelling", "barking like a dog", moving arms"); Hamernik Depo., at 32-33 ("He was thrashing about, screaming, trying to free himself . . . Like, pulling his arms on the restraints and whatnot.").

Sgt. Hamernik went off duty at 6:00 a.m., at which point, at his direction, Plaintiff had been in the restraint chair for less than three and one-half hours. (Hamernik Depo., at 32). Similar time periods have been found not to violate clearly established law. *See Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 533 (6th Cir. 2018) (concluding plaintiff failed to meet his summary judgment burden of demonstrating that use of a restraint chair for three hours violated clearly established law); *Grinter* v. *Knight*, 532 F.3d 567, 573-74 (6th Cir. 2008) (no due process violation from being held in four-point restraints for four hours); *Rodriguez Ortiz v. Jefferson Cty.*, 2019 WL 5932757, at *8 (E.D. Tenn.) (finding plaintiff had not shown placement in restraint chair for somewhere between two and five hours did not violate clearly established law).[19]

Most importantly, Plaintiff has not pointed to any binding precedent, much less clearly establishing "beyond debate", *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013), that in the pretrial context (and under similar circumstances) either the use of a restraint chair or being kept in a restraint chair for the time period at issue here, under the circumstances presented,

---

19. In a footnote, Plaintiff contends Defendants failed to follow an "ACA" policy he attaches. (Doc. 138, at 15 n.9) (citing Doc. 138-14). The attachment consists of a single photocopied page, including a policy regarding "Four/Five Point Restraints", seemingly from the American Correctional Association. Defendants object to the consideration of this document on grounds that it has not been authenticated, there is no evidence Erie County or the Sheriff had adopted this policy, and the document is hearsay under Federal Rule of Evidence 801(c). For all the reasons articulated by Defendants, the Court finds this document inadmissible.

violates the Constitution. *See also Washington v. Ondrejka*, 822 F. App'x 104 (3d Cir. 2020) (holding that inmate's placement in a restraint chair for five hours was reasonable because of his combative and continued uncooperative behavior, and because the length of restraint was less than the maximum amount permitted by prison regulation (eight hours), therefore the Eighth Amendment was not violated).

<u>Officers Barrett and Paytosh</u>

The only argument Plaintiff makes as to Defendants Barrett and Paytosh is "they assisted . . . in applying excessive force and strapping Mr. Whyde to the chair. . . . Defendant Barrett is seen actually choking Mr. Whyde. . . After beating and slamming Mr. Hyde's head against the wall, this Court can see these defendants applying pressure to all areas of his neck, jaw and face." (Doc. 138, at 31); *see also* Doc. 138, at 35 ("Paytosh and Barrett is seen on camera having her hands around Mr. Whyde's throat choking him and later his jaw bones . . . ."); 39 ("Defendant Barrett was choking [Plaintiff], and Defendant Paytosh got involved by assisting in the brutality."). He does not set forth any specific legal argument, or cite clearly established caselaw to support his claim that Barrett or Paytosh's specific individual actions amounted to excessive force.

As set forth above, to the extent Plaintiff asserts Defendants Paytosh and Barrett committed a constitutional violation by assisting placing Plaintiff in the restraint chair, they are entitled to qualified immunity because Plaintiff has not established that doing so violated clearly established law. So too is Barrett entitled to summary judgment on Plaintiff's claim that she "choked" him. For this proposition, in addition the video, Plaintiff cites two pages of Hamernik's deposition, neither of which has any reference to Barrett or choking. (Doc. 138, at 31) (citing Doc. 112, at 8, 68). The video depicts Barrett holding Plaintiff's head and chin/neck, in an effort

to keep his head still. Her right hand is on Plaintiff's chin and throat, and her left hand is holding him by the top of his head. Plaintiff continues to yell and use his body to resist the officers during this time.

At base, the Court finds that Plaintiff has not pointed to evidence to create a genuine issue of material fact that either Barrett or Paytosh used excessive force. Moreover, even if he had, he has not "identif[ied] a case that put [Barrett or Paytosh] on notice that [their] specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8. As such, they are entitled to qualified immunity and summary judgment.

<u>Spit Hood</u>

Plaintiff also seemingly alleges the use of the spit hood/mask was a use of excessive force. *See* Doc. 74, at ¶ 71 ("they placed a spit shield/hood over his head"); Doc. 138, at 16 ("Thereafter, Mr. Whyde was forced into a restraint chair with a spit mask/hood over him.").

Defendants point to the video, asserting it shows Plaintiff spitting. This is accurate. In opposition, Plaintiff argues "Defendants" had "choked" him, "pulled his jawbone out of place and/or applied unnecessary pressure to it", and "like anyone else whose pressure points were aggravated, would spit due the saliva secretion in the mouth" (Doc. 138, at 16). This argument – particularly the allegation that Plaintiff's jawbone was pulled out of place – is unsupported by the evidence. Further, in Plaintiff's deposition, he could not recall spitting, but did not deny he did so. (Whyde Depo., at 40). And again, Plaintiff has not responded to Defendants' qualified immunity argument.

Once again, the Sixth Circuit has explained "pepper spray, Tasers, arm bars, restraint devices, spit hoods, etc. all have their legitimate place." *Jennings*, 659 F. App'x at 871. And Plaintiff has pointed to no clearly established law that the use of a spit hood in these

circumstances (regardless of the reason why Plaintiff was spitting) was objectively unreasonable and thus a constitutional violation. To the extent Plaintiff asserts an excessive force claim for use of the spit hood and asserts it with enough specificity against any particular Defendant, such Defendants are thus entitled to qualified immunity.

*Monell* Claim Against Sheriff Sigsworth / County Commissioners

Plaintiff's Amended Complaint seemingly asserts a *Monell* claim against Sheriff Sigsworth related to the excessive force claim. *See* Doc. 74, at ¶ 119.[20]

Again, a county may only be held liable for the constitutional violations of its employees under 42 U.S.C. § 1983 if those actions are the result of a practice, policy, or custom of the municipality itself. *Monell*, 436 U.S. at 694. Thus, for a county to be liable for a violation of § 1983, a plaintiff must show: (1) a deprivation of a constitutional right; and (2) that the municipal entity is responsible for that deprivation. *Doe,* 103 F.3d at 505–06.

---

20. Plaintiff points to no evidence suggesting Sigsworth was directly involved in any use of force at issue. He seemingly makes two arguments regarding Sigsworth in his individual capacity: (1) his "ratification of [the individual officers'] unconstitutional actions (Doc. 138, at 41); and (2) he is statutorily obligated under Ohio Revised Code § 341.01 to keep inmates at the Erie County jail safe (Doc. 138, at 17, 26, at n.21). But, as to Plaintiff's first argument – he points to no admissible evidence demonstrating this alleged "ratification" and he thus cannot survive summary judgment on such a claim. *See Essex v. City of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013) ("For individual liability on a failure-to-train or supervise theory, the defendant supervisor must be found to have encouraged the specific incident of misconduct or in some other way directly participated in it.") (internal quotation omitted); *see also Robertson*, 753 F.3d at 615 (plaintiff must prove "that the violation was committed *personally* by the defendant."); *Pineda*, 977 F.3d at 491 ("[I]n the face of [a] motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial.") (internal quotation omitted). And as to his second argument, even assuming such a claim were valid – "[s]ection 1983 provides a means of vindicating federal rights; '[i]t does not cover official conduct that allegedly violates state law.'" *Beckham v. City of Euclid*, 689 F. App'x 409, 414 (6th Cir. 2017) (quoting *Michael v. Ghee*, 498 F.3d 372, 375 (6th Cir. 2007) (citation omitted)). Therefore, any claim against Sheriff Sigsworth in his individual capacity for excessive force must be dismissed.

Defendants have submitted evidence in the form of the Erie County Sheriff's Office Use of Force Policy (Doc. 115-5) and testimony from jail expert Sean Stewart (Doc. 125-6).[21] Plaintiff's opposition does not clearly respond to this argument. *See* Doc. 138. The Court thus finds Plaintiff has not "(1) identif[ied] the municipal policy or custom, (2) connect[ed] the policy to the municipality, and (3) show[n] that his particular injury was incurred due to execution of that policy." *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003). As such, Defendants are entitled to summary judgment on Plaintiff's *Monell* claim as it relates to Plaintiff's excessive force cause of action.

Intentional Infliction of Emotional Distress

Finally, Plaintiff brings a claim for intentional infliction of emotional distress against all Defendants. (Doc. 74, at 31). All Defendants assert they are entitled to Ohio Revised Code Chapter 2744 immunity as to this claim. *See* Doc. 125-1, at 59-60; Doc. 126-1, at 19-22.

Under Ohio law, a "claim for intentional infliction of emotional distress requires proof of the following elements: '(1) the defendant either intended to cause, or knew or should have known, that his actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure it.'" *Walters v. Carter*, 2020 WL 1066063, at *7 (Ohio Ct. App.).

---

21. "[A] court may properly consider videotape evidence at the summary-judgment stage, *Scott*, 550 U.S. at 380–81, 127. . ., so an expert opinion based on such evidence is appropriate, *see* Fed. R. Evid. 702; *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 663 (6th Cir. 2005) (holding that an expert opinion is permitted at the summary judgment stage so long as the opinion is not "a conclusory assertion about ultimate legal issues" (citation omitted))." *Griffin v. Hardrick*, 604 F.3d 949, 955 (6th Cir. 2010).

Ohio Revised Code Chapter 2744 grants immunity to political subdivisions and to employees of political subdivisions for actions arising within the course or scope of their employment.

The County, and the Health District are thus entitled to immunity unless an exception in Ohio Revised Code § 2744.02(B) applies. *See* Ohio Rev. Code § 2744.02(A)(1) ("Except as provided in division (B) of this subsection, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."). Plaintiff cites Southern District of Ohio case law finding Chapter 2744 unconstitutional, but acknowledges the Sixth Circuit has subsequently found it to be constitutional. *See Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 697 (6th Cir. 2006) ("The district court properly held that the Liability Act, Ohio Rev. Code §§ 2744.02, 2744.03, does not violate article I, sections 5 and 16, of the Ohio constitution because the Supreme Court of Ohio has never held the statute unconstitutional and because Ohio's intermediate courts are unanimous in upholding the statute."). Plaintiff presents no further argument that the County or Health District fall within an exception to immunity. As such, the entity defendants are entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim. *See Stephens v. City of Akron*, 729 F. Supp. 2d 945, 965 (N.D. Ohio 2010) (granting statutory immunity to city on plaintiff's tort claims where plaintiff failed to argue any exception to Section 2744.02(B) applies).

As to the individual Defendants, Ohio law grants immunity from civil suits to employees of political subdivisions unless:

> (a) the employee's acts or omissions were manifestly outside the scope of their employment or official responsibilities;

(b) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or]

(c) civil liability is expressly imposed by a section of the Revised Code.

Ohio Rev. Code § 2744.03(A)(6)(a)–(c). Because all the actions at issue in this case were within the scope of Defendants' employment and because civil liability is not expressly imposed by another section of the Ohio Revised Code, Plaintiff must show each individual Defendant acted "with malicious purpose, in bad faith, or in a wanton or reckless manner." *Id.* § 2744.03(A)(6)(b).

"When federal qualified immunity and Ohio state-law immunity under [Ohio Rev. Code] § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense 'through the lens of federal qualified immunity analysis.'" *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009)). "[T]he officers' state-law statutory-immunity defense therefore "'stands or falls with their federal qualified immunity defense." *Wright v. City of Euclid*, 962 F.3d 852, 878 (6th Cir. 2020) (quoting *Hopper*, 887 F.3d at 760).

As set forth above, the Court finds Defendants Beatty, Proy, Kerr, Barrett, Salyers, Paytosh, Hamernik, Sigsworth, Eldridge, Cromwell, and Burgess entitled to qualified immunity. As such, they are also entitled to Ohio state-law immunity on Plaintiff's state law claim. *Wright*, 962 F.3d at 878.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that the County Defendants' Motion for Partial Summary Judgment (Doc. 125) be, and the same hereby is, GRANTED; and it is

FURTHER ORDERED that the Health Defendants' Motion for Summary Judgment (Doc. 126) be, and the same hereby is, GRANTED.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE