## IN THE UNITED STATES DISTRICT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**JOHN WHYDE, JR.,**                              CASE NO. 3:19 CV 683

     Plaintiff,

     v.                                    JUDGE JAMES R. KNEPP II

**PAUL A. SIGSWORTH, et al.,**

     Defendants.                           **MEMORANDUM OPINION AND
ORDER**

### INTRODUCTION

This is a prisoner civil rights suit brought by Plaintiff John Whyde, Jr. related to his August 2019 arrest and subsequent incarceration at the Erie County Jail.[1] He brings claims of excessive force, deliberate indifference, and intentional infliction of emotional distress against Defendants Erie County/Erie County Board of Commissioners, Paul A. Sigworth, Thomas Casey Proy, Daniel Orzech, and Timothy Bunting (hereinafter "County Defendants"), as well as against Erie County General Health District Board of Health, Missy Faulkner, Kelly Olinger, Donna Hartson, and Anthony Tesmond (hereinafter "Health Defendants"). Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367. Currently pending before the Court are the County Defendants' Motion for Summary Judgment (Doc. 168), and the Health Defendants' Motion for Summary Judgment (Doc. 165). Both motions are fully briefed and ripe for decision. For the reasons discussed below, the Court grants both motions.

---

1. This case in its entirety encompassed two sets of claims – one related to Plaintiff's treatment while incarcerated in 2017 and one related to Plaintiff's 2019 arrest and incarceration. The instant opinion only addresses the 2019 claims. The Court previously granted summary judgment on the 2017 claims. (Doc. 193) and entered final judgment thereon pursuant to Federal Civil Rule 54(b) (Doc. 196).

**BACKGROUND**

The claims relevant to the instant motions relate to Plaintiff's arrest on August 23, 2019, and his subsequent incarceration from August 24, 2019 through September 16, 2019 in the Erie County Jail.

<u>Interaction on Plaintiff's Porch</u>

On August 23, 2019, Plaintiff's neighbor called 911 to report she saw Plaintiff on his front porch "smacking his girlfriend pretty good". (911 recording, filed at Doc. 170). She said someone else at the house "pulled him off of her", Plaintiff went inside, and the girlfriend was on the porch crying and saying that she wanted to leave. Plaintiff testified that this was all untrue.

Erie County Sheriff's Deputies Daniel Orzech and Timothy Bunting responded. The dispatcher told them they were responding to a "physical domestic" and relayed the neighbor's report Plaintiff assaulted his girlfriend on the front porch, but that he was now inside the house and the girlfriend was outside. (Dispatch recording, filed at Doc. 170).

The following facts come from, in large part, Deputy Orzech's body camera video[2], filed at Doc. 167. As Orzech and Bunting approached Plaintiff's house, it was dark, but lights were on inside the house, and there were outdoor lights near the front door. The deputies carried flashlights. A large pit bull inside the house could be seen through the glass front door; it was barking. To approach the front door, the officers went onto the front porch, which contained various furniture. Deputy Bunting yelled "hold that dog!" repeatedly. Both Vassie Maharaj, Plaintiff's stepfather, and Plaintiff approached the front door, and Maharaj walked outside, shutting the door behind him.

---

2. The body camera video is filed at Doc. 167. Any references to a timestamp herein are to that video.

2

Plaintiff stepped out onto the porch, shirtless. Deputy Orzech saw scratches on Plaintiff's chest and neck. (Orzech Depo., Doc. 152, at 13); (Doc. 152-1) (Incident Report). Deputy Bunting reported Plaintiff appeared unsteady and intoxicated. (Doc. 151-1, at 6). Bunting put his hand on Plaintiff's arm and asked him to step over near the side of the door. Plaintiff pulled his arm away and said, "Get off me." Orzech asked Plaintiff where "his girl" was, to which Plaintiff responded, "Which one?" Orzech replied he was looking for "the one that was just here"; Plaintiff said he did not know where she was. Deputy Orzech then asked Plaintiff how he got "scratched up". Plaintiff said he got the scratches from his dogs. When Deputy Orzech expressed skepticism, Plaintiff threw his arms out to the side and said, "My dogs scratched me up, dude." He then sat down in a chair by the front wall of the house. While seated, he rubbed the back of his neck. The deputies continued to ask Plaintiff where "his girl" was, to which Plaintiff responded, "go find her". Bunting then asked if he could go into Plaintiff's house, but Plaintiff told him he could not without a warrant. Plaintiff was gesturing with his hands during this conversation. Bunting said, "we want to make sure she's okay", to which Plaintiff responded, "you go get a mother fucking warrant", gesturing with his right hand toward Bunting.

Immediately after this, Plaintiff arose abruptly from his seated position, pushing up from the arms of the chair, facing Deputy Bunting. He started to raise his right arm. Bunting testified he was intimidated and afraid at this point; he believed Plaintiff might have been attempting to punch or strike him. (Bunting Depo., Doc. 151, at 32, 25). He pushed Plaintiff away "because he got out of the chair and he got into my - - got into my face." (Bunting Depo., Doc. 151, at 33); (Doc. 151-1, at 6) (Incident Report). Orzech also perceived the move as aggressive because "[w]hen he stood up he got into [Bunting's] personal space in a fast manner." (Orzech Depo.,

Doc. 152, at 17). Plaintiff landed back on the chair on which he had been sitting and the chair tipped to the side; he yelled out as he fell.

Officer Bunting's left hand then went to the right side of Plaintiff's throat/neck (2:19) and the Deputies attempted to grab Plaintiff's wrists. Plaintiff "tried to squirm out of his grasp." (Doc. 74, at 7). At this point the video is obscured to some degree by the officers' bodies as Bunting appears to be on top of Plaintiff, but Plaintiff is yelling and can be heard saying "You want to hit me?" (2:24-25) and Orzech, after repeating "Johnny!" loudly several times, uses his radio to communicate, "he's resisting." (2:31). The video depicts Plaintiff's right arm moving around during this time.

Deputy Orzech used his left hand to grab Plaintiff's right arm. Plaintiff asserts Bunting then said, "I'm going to crack you in the fucking head, man." Deputy Bunting testified it was his voice and he heard the words "fucking head, man" on the video. (Doc. 151, at 45). Immediately thereafter, Deputy Bunting said, "You gotta stop it, right now." (2:35-36). At this point, Plaintiff's left arm was moving.

Bunting testified he had his hand on Plaintiff's neck, but said he did not choke him. (Doc. 151, at 14, 50, 66-67). Orzech saw Bunting's hand "on the side of [Plaintiff's] throat." (Doc. 152, at 39). Plaintiff testified Bunting choked him with one hand and that he could not breathe for fifteen seconds. (Plaintiff Depo., Doc. 150, at 15, 67).

Mr. Maharaj can be heard saying "Why are you choking him?" (2:40). Plaintiff can then be heard breathing heavily and yelled "Video it. Video it, dad. Video it, now!" (2:41-43), to which Maharaj responded, "I'm watching it." Deputy Bunting testified that attempting to choke a suspect is not proper procedure in subduing someone. (Bunting Depo., Doc. 151, at 72).

At this point, Plaintiff was on his back on the porch, with the right side of his head against the wall of the house. Deputy Bunting was on top of him, and Plaintiff's left hand was gripping the edge of the window frame. Bunting moved his left hand from Plaintiff's neck area to his left wrist (2:46); he testified he was trying to "get [Plaintiff's] grip off the ledge" (Doc. 151, at 82). Plaintiff continued to yell. Bunting's flashlight was in his right hand. Plaintiff says "I ain't touching you." (2:49). Bunting then pushed down with his left hand on Plaintiff's left hand. Plaintiff's hand broke free from the window ledge and Bunting's body went forward. Plaintiff testified that at this point Bunting hit him in the head with the flashlight in his right hand. (Doc. 150, at 52-53, 57, 59, 67).[3] One of the Deputies said: "Roll over on your back!" (2:54). Plaintiff said, "Oh my god, he beat me." (2:55). Shortly thereafter, he said, "You better get the fuck off me or I'm going to kill you, motherfucker." (2:59). At some point, Plaintiff grabbed Orzech's flashlight. (Plaintiff Depo, Doc. 150, at 74-76). Plaintiff continued his threats – "My dad will kill you, bitch!" – while Bunting and Orzech instructed him to let go of the flashlight. (3:00-3:02).

---

3. Bunting testified that the flashlight struck Plaintiff accidentally:

> I'm trying to maintain the flashlight into my arm, also trying at the same time to gain control of Mr. Whyde's arm, which was actively resisting from me trying to grab it, which he's gripping the window ledge. I'm trying – Mr. Whyde outweighs me by probably a hundred pounds, probably maybe six inches taller than I am. I have to exert more of my physical body weight and force onto getting the grip of Mr. Whyde's hand to break the ledge – to come off the ledge so I can gain control of his arm. At that moment, when I'm trying to get Mr. Whyde's grip off the ledge with his fingers which he's holding the window ledge, I'm using all my body weight, my force, to get his hand off there. When his fingertips finally break from the window ledge, his arm momentum and my body weight momentum go forward in which I still have my flashlight into my hand which grazes accidentally across Mr. Whyde's either – I don't know if it was his nose or his forehead or his facial region, but it was not the back of the head, the top of the head or anything like – it was pure - - pure - - my body weight momentum and Mr. Whyde's momentum were - - the force of it was - - made me cross his body, his face.

(Doc. 151, at 82-83).

Plaintiff responded, "He hit me with it." (3:04); Plaintiff also testified he grabbed the flashlight in response to being hit and to avoid being hit again (Plaintiff Depo., Doc. 150, at 74-76). At this point, Deputy Bunting had moved his knee to Plaintiff's left temple, pinning his head against the wall of the house for a second or two.

Plaintiff then said: "I'm done, I'm done" (3:06) and the Deputies continued to give Plaintiff instructions to "roll over" on his back, then correcting the statement to "roll over on your belly." (3:11-3:15). Plaintiff said, "I will", and the Deputies rolled his body over. (3:16-3:18). As they did so, Plaintiff said, "why you gotta be so excessive, dude?". With his right arm on the back of Plaintiff's neck/upper back, Deputy Bunting pushed Plaintiff's head toward the floor of the porch, telling Plaintiff to "stop", and "don't be doing that shit." (3:20). Plaintiff's face appeared to hit the metal bar of the tipped-over porch chair, and he yelled, "ow, my teeth!" Plaintiff testified that in response, Bunting "instead of letting up . . . pushe[d] more force into it.", but Plaintiff was able to "pull[] back with enough force to move . . . not even a half inch" to get his teeth off the chair bar. (Plaintiff Depo., Doc. 150, at 68). Bunting said to Plaintiff: "what you're going to do is you're going to listen", to which Plaintiff responded, "take the badge off, bitch." Plaintiff continued to verbalize profanities throughout. While Bunting held Plaintiff down, he can be heard yelling "get off my ear, get off my ear, bitch!" (3:46-3:47) and "you're killing me dude" (3:42). While Bunting restrained Plaintiff, Orzech secured Plaintiff's hands using two sets of handcuffs. *See* Orzech Depo., Doc. 152, at 67. After Plaintiff was in handcuffs, Bunting said "you're going to shut your mouth, and you're going to do exactly what I say. You understand?" (4:20). Plaintiff then said, "You done beat me, you fucking piece of shit. You done beat me you motherfucker." (4:29-4:33). Bunting then stood up and moved away from Plaintiff.

A third Deputy, Sgt. Daniel Kautz arrived. He helped Plaintiff to his feet and Bunting and Kautz walked him off the porch. (5:05-5:13). Plaintiff turned to Deputy Orzech and said "get him off me, get him off me dude, walk me to the car dude. Walk me to the car please."

As the officers walked Plaintiff toward the car, he moaned, cried out, told the officers his head hurt, and asked to go to the hospital. The officers called an ambulance. While waiting for the ambulance, Plaintiff verbalized that the officers beat him up, and verbalized additional threats toward Deputy Bunting: "I'm going to beat your little punk ass, little motherfucker, if not in court" (7:29-7:31); "I'll beat your ass." (8:18).

<u>Hospital</u>

Plaintiff was taken to the emergency room at Firelands Medical Center and examined. *See* Doc. 168-5, at 20-30. The records note Plaintiff complained of head pain, described him as "animated and agitated", say he had no hematomas, and note the scratches on his chest and abdomen. *Id.* at 20. A head and neck CT scan was negative. *Id.* at 21, 26-27. Plaintiff testified he was not examined "very well" at the hospital, and that he had a lump or knot on the side of his head. (Plaintiff Depo., Doc. 150, at 63-65). The Firelands records also indicate Plaintiff had a prescription for zolmitriptan (Zomig), for headaches. (Doc. 168-5, at 22).

<u>Incarceration</u>

Plaintiff entered the Erie County Jail on August 24, 2019. His intake screening form indicates he was intoxicated, and many answers to screening questions are listed as "unknown due to intox[ication]." (Doc. 110-3). The intake form has a statement at the bottom indicating: "I hereby Authorize the release of the above information regarding my Medical/Mental health and condition." *Id.* at 3. On the "inmate signature line", someone wrote "INTOX." *Id.* A different copy of this intake form completed later in the day bears Plaintiff's signature. *See* Doc. 162-3, at

12. Missy Faulkner, an Erie County General Health District Nurse working at the jail, took Plaintiff's vitals. (Doc. 161-1, at 1). Plaintiff told her he was taking Oxycodone, Methadone[4], and Gabapentin. *Id.*

At a health appraisal with Nurse Faulkner the following day, Plaintiff again reported taking these medications, in addition to Cymbalta. (Doc. 110-4, at 1). Plaintiff did not remember this health appraisal. (Doc. 110, at 209-10). Nurse Faulkner further documented Plaintiff's pharmacy as Discount Drug Mart in Clyde, Ohio, took Plaintiff's vital signs, and noted "Maalox / acetaminophen administered" pursuant to the withdrawal protocol. (Doc. 110-4, at 1). Donna Hartson, another Erie County Health District Nurse working at the jail, contacted Plaintiff's pharmacy and confirmed prescriptions for Gabapentin, Methadone, Oxycodone, and Celexa. (Hartson Depo., Doc. 162, at 19); Doc. 161-1, at 2. Plaintiff was then provided with Celexa. (Hartson Depo., Doc. 162, at 35); (Faulkner Depo., Doc. 161, at 20).

Plaintiff was not provided with Gabapentin, Oxycodone, or Methadone because those "were not medications distributed within the jail." (Doc. 165-1, at 6); (Doc. 161-1) (inmate progress notes indicating nursing staff told Plaintiff that Gabapentin and migraine medications were not passed in jail). The Health District admitted it had a policy in place during Plaintiff's 2019 jail stay that prohibited any inmate from receiving an opioid prescription medication or Methadone. (Doc. 137-7, at 1). Dr. Tesmond testified the reasons for not prescribing such medication in a jail setting include avoiding inmate self-harm and avoiding inmates selling narcotic medications. (Tesmond Depo., Doc. 164, at 66). The jail instead provides non-narcotic pain medication. *Id.*

---

4. Plaintiff's booking form indicates he had Methadone on his person when he was booked and it was placed in a medication box at the jail. (Doc. 161-3, at 7).

Plaintiff was started on an opiate withdrawal protocol involving Maalox, acetaminophen (Tylenol), and Gatorade. (Doc. 161, at 25). During the next four days, Nurses Faulkner and Hartson monitored Plaintiff. *See* Doc. 161-1. These records reflect that the nurses took Plaintiff's vital signs, provided water, Gatorade, Maalox, and Tylenol. *Id.* at 1-2. Plaintiff avers he suffered from withdrawal symptoms including nausea, sweating, and diarrhea, which were most severe during the first several days, but continued through his entire jail stay. (Doc. 177-2, at ¶ 36). A note on August 27, 2019 states Plaintiff's withdrawal symptoms had decreased and Plaintiff was moved to the general population. (Doc. 161-1, at 2).

On September 3, 2019, Plaintiff filed a grievance with Lt. Proy. (Doc. 162-5). Therein, he asserted he had asked for Methadone and Zomig for his head trauma, but medical staff had told him he could not have it; Plaintiff said he was "having severe headaches." *Id.* at 2. In a later grievance filed three days later, he stated he "thought [he] mentioned his headache medication" during booking "and again when in seg[regation]." *Id.*[5]

The nursing notes reflect that on August 28, 2019, Plaintiff reported blurry vision and Nurse Hartson instructed him to notify staff if it persisted or worsened. (Doc. 161-1, at 2). Another note on August 30 reflects that Plaintiff asked why he was not receiving his Gabapentin and Hartson informed him it was not provided in the jail. *Id.* at 2-3. On September 4, 2019, Nurse Hartson noted Plaintiff "inquired again about his [G]abapentin and [Z]omig" and she told him "that we did not do migraine medications here". *Id.* at 3. The notes then reflect Plaintiff requested Tylenol and Nurse Hartson provided it. *Id.* The following day, Nurse Olinger noted Plaintiff complained of "not having any pain medication for migraines, he needs his

---

5. This grievance does not identify to whom Plaintiff "thought" he gave this information. *See* Doc. 162-5

Gapapentin"; Nurse Olinger noted Plaintiff "was informed multiple times that medication is not passed here" and that he "did not want" Tylenol. *Id.*

On September 7, 2019, Nurse Hartson noted Plaintiff complained of pain from a head injury. *Id.* at 4. She provided him with a records release, noting that if the jail could obtain his diagnosis records, she could present it to the jail physician "and see if there was anything we could do to alleviate the pain." *Id.* Plaintiff wanted to look the form over with his attorney first, and ultimately never signed it. At one point, on September 13, he told nursing staff that he would "sign a release for the pharmacy only". *Id.* at 6.

On September 11, 2019, Plaintiff's mother called to report Plaintiff was having severe headaches and suffering. (Doc. 161-1, at 4). On September 13, 2019, Plaintiff's father brought Zomig to the jail, but Nurse Faulkner told him outside medication was not permitted. *Id.*

Dr. Tesmond operated under a contract with the Health District to provide health services to Erie County Jail inmates. (Tesmond Depo., Doc. 159, at 6-9). Dr. Tesmond had no specific recollection of Plaintiff and did not see him during his time in the jail. *Id.* at 10, 17; *see also* Doc. 137-7, at 1. Dr. Tesmond did not recall whether he was ever told Plaintiff wanted to see him. *Id.* at 18. He testified he was "sure [he was told]" (*id.* at 20) and was "sure the nurse [brought to his attention]" (*id.* at 24) that Plaintiff made medication requests. He did not see this communication charted anywhere, but also said such information would not necessarily go in the chart. *See id.* at 21, 24, 38. When asked whether the prison will administer a medication an inmate has taken in the past, he responded: "Once we can substantiate that he actually was prescribed it, we can confirm when it was last filled by the pharmacy, and we have a provider's record saying that he was given - - what he was given and the reason why he was given it . . . then we can make a determination if we're able to continue it." *Id.* at 22.

Dr. Tesmond testified that Gabapentin "can be used for anything from seizure medicine to headaches to pain medicine - - long-term pain medication, short-term treatment of acute pain as well." *Id.* at 26. Dr. Tesmond further testified – in contradiction to the nursing notes – that on admission the nurse contacted the pharmacy Plaintiff provided and "got the answer that the only medication he was on was Celexa." *Id.* at 28.; *see also id.* at 51-53. Dr. Tesmond further testified "there's an interaction between Gabapentin and Celexa" and he would "not . . . put someone on a medication that, No. 1, we couldn't prove he was even on based on the records we were allowed to see and, No. 2, we have a potential reaction." *Id.* at 34. He further testified that there are drug interactions between Celexa and Zomig. *Id.* at 51.

Dr. Tesmond testified Plaintiff's "history saying that he had head trauma" was the only way he would have been aware Plaintiff had such an injury. *Id.* at 35. He further testified Plaintiff's request for Zomig would have made him ask "why does he want Zomig[?]", and if the response was headaches, that "would have then prompted us to request a release from his treating physician." *Id.* at 36. He said this was protocol. *Id.* ("[W]hen someone's requesting medication that we can't document from a pharmacy . . the next step would be try to have the . . . patient sign a Release of Information form that could assist us in determining what medication they are, in fact, taking.").

He testified that if an inmate is complaining of a medical problem such as migraines, he could conduct an independent evaluation without receiving prior treating history. *Id.* at 43-44. He testified that "[d]epending on the conditions", a physician evaluation could be appropriate care for a migraine, and he acknowledged that some types of migraines do not respond well to ibuprofen or Tylenol. *Id.* at 47-48.

11

Dr. Tesmond testified only a physician is authorized to prescribe medication to inmates at the jail; standing orders for over-the-counter medications can be provided by nurses at inmate request. *Id.* at 41.

During his time at the Erie County Jail, Plaintiff testified he was only permitted Tylenol three times per week after his withdrawal protocol ended, and it was not dispensed at night. *See* Plaintiff Depo., Doc. 150, at 162 (stating that he was only permitted to have Tylenol "three times a week or something"); Doc. 177-2, at ¶¶ 46-47 (stating that Plaintiff was informed he could not have Tylenol at night and that it was only dispensed three times per week); Doc. 161-2, at 11 (Erie County Jail policy permitting a maximum of three doses of Tylenol per week); Doc. 161-1, at 4, 7 (inmate progress notes indicating Plaintiff requested Tylenol on September 7 and 15, 2019 and was told by Nurses Hartson and Olinger it was not offered at night).

Plaintiff avers that he "suffered from a constant throbbing pain in [his] back, left leg, ankle and knees continuously during [his] incarceration" and that Tylenol "was not sufficient to control or even lessen [his] pain at times." (Doc. 177-2, at ¶ 37). He says that "[o]n a few occasions" while suffering a migraine, he requested Tylenol "but the nurses refused to give it" to him. *Id.* at ¶ 38. He avers he suffered migraines "at least twice a week" while in the jail and "complained to all the nurses" about them. *Id.* at ¶ 42. He further says that the nurses informed him that his migraine medication, as well as his prescribed Gabapentin, Methadone, and Oxycodone were not passed in jail. *Id.* at ¶¶ 43, 45, 48, 52. Finally, Plaintiff asserts he asked Nurses Faulkner, Olinger, and Hartson "at various times to see the jail doctor" but he "was never permitted to see him." *Id.* at ¶ 44.

Plaintiff was released from the Erie County Jail on September 16, 2019.

Charges

As a result of the events at his house, Plaintiff was indicted on a charge of intimidation, and charged with aggravated menacing, resisting arrest, and disorderly conduct while intoxicated. (Doc. 168-5, at 10-19, 28-30). He pled no contest and was found guilty of aggravating menacing in violation of Ohio Revised Code § 2903.21. *Id.* at 5-8.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id*. The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

**DISCUSSION**

Plaintiff brings two claims under 42 U.S.C. § 1983: (1) an excessive force claim related to his arrest on August 23, 2019; and (2) a deliberate indifference to medical needs claim related to his treatment while incarcerated. He also brings an Ohio law intentional infliction of emotional distress claim. For the reasons discussed below, the Court finds Defendants are entitled to summary judgment on all claims.

<u>Declarations / Motions to Strike</u>

At the outset, the Court must resolve an evidentiary dispute. Both the County Defendants and the Health Defendants ask this Court to disregard or strike Plaintiff's February 6, 2022 Declaration (Doc. 177-2).[6] The County Defendants further ask the Court to disregard two other Declarations submitted in conjunction with Plaintiff's opposition brief.

Federal Civil Rule 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Further, the "sham affidavit" doctrine prohibits a party from "creat[ing] a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Johnson v. Ford Motor Co.*, 13 F.4th 493, 501 (6th Cir. 2021) (quoting *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)) (internal quotation mark omitted); *see also Crawford v. Chipotle Mexican Grill, Inc.*, 773 F. App'x 822, 826 (6th Cir. 2019) (applying sham affidavit doctrine to declaration). "In determining the affidavit's admissibility at summary judgment, the district court must first consider 'whether the affidavit "directly contradicts the nonmoving party's prior sworn testimony,"' which, '[i]f so, absent a

---

6. Plaintiff sought and obtained leave to respond to the Health Defendants' motion to strike (Doc. 189), and the Health Defendants replied (Doc. 190).

14

persuasive justification for the contradiction, the court should not consider the affidavit.'" *Johnson*, 13 F.4th at 501 (quoting *Reich v. City of Elizabethtown*, 945 F.3d 968, 976 (6th Cir. 2019)). The Sixth Circuit has suggested that the rule can apply in two situations. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908–09 (6th Cir. 2006). It can apply when a witness's affidavit "directly contradicts" the witness's prior testimony. *Id.* at 908. "And even without a direct contradiction, it can also apply when the witness's affidavit is in tension with that prior testimony as long as the circumstances show that the party filed the affidavit merely to manufacture 'a sham fact issue.'" *Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832, 842 (6th Cir. 2021) (citing *Aerel*, 448 F.3d at 908)); *see also Price v. Worldvision Enterprises, Inc*., 455 F. Supp. 252, 260 (S.D.N.Y.1978) (affidavit testimony departs "so markedly from the prior deposition of defendants' key witness, . . . as to brand as bogus the factual issues sought to be raised"), *aff'd*, 603 F.2d 214 (2d Cir. 1979).

However, this rule does not "prevent[ ] a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit," which serves to "fill[ ] a gap left open by the moving party" and "provide[ ] the district court with more information, rather than less, at the crucial summary judgment stage." *Aerel*, 448 F.3d at 907. This is because a deponent is not required "to volunteer information the questioner fails to seek." *Reich*, 945 F.3d at 976; *see Briggs v. Potter*, 463 F.3d 507, 513–14 (6th Cir. 2006) (finding district court abused its discretion in striking a reference in a post-deposition affidavit on which deponent "was not expressly asked" at deposition despite being "questioned generally about that . . . conversation").

But "[w]here a deponent is 'asked specific questions about, yet denie[s] knowledge of, the material aspects of her case, the material allegations in her affidavit directly contradict her

deposition.'" *Reich*, 945 F.3d at 976 (second alteration in original) (quoting *Powell-Pickett v. A.K. Steel Corp.*, 549 F. App'x 347, 353 (6th Cir. 2013)); *see also id.* at 977 ("Counsel asked several times for her recollection . . . . In the face of this direct and thorough questioning, Reich said that she did not know. Her affidavit, asserting that she *does know*, therefore contradicts."); *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) ("Several of our cases indicate that a district court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember."); *Bryant v. U.S. Steel Corp.*, 428 F. App'x 895, 897 (11th Cir. 2011) ("As the district court noted, Bryant's affidavit, in which she stated that she remembered the exact date on which she received the right-to-sue letter, flatly contradicted her earlier deposition testimony, in which she stated that she did not remember the date.").

*County Defendants*

The County Defendants move to strike Plaintiff's Declaration on the grounds that it "is not based on personal knowledge" and that it contains medical statements and opinion which Plaintiff is not qualified to render. The County Defendants assert in large part that Plaintiff's earlier deposition testimony demonstrates his knowledge of the underlying events is limited, and his testimony is based on viewing the video evidence, rather than on his personal recollection. They cite the following testimony from Plaintiff's deposition:

Q:      So there was a struggle there on the porch?

A:      I wasn't struggling. He was struggling just to hurt me more is what I felt.

Q:      Well, were you squirming around?

A:      It happened so fast I don't, *I don't remember.*

Q:      Okay.

                                    * * *

Q:      Did you relax your body?

16

A:     *I don't remember, dear.*

Q:     Okay. And your body was, was moving and they were trying to grab your arms when you were on the porch?

A:     I don't know. I mean you tell me. Did you see that on the video? Then that's what happened.

Q:     You don't remember?

A:     *I can't recall. I can't recall how exactly. I just know the, the main moral of the story and that they were wrong, that's all I know.*

(Plaintiff Depo., Doc. 150, at 52-53) (emphasis added). They further cite Plaintiff's numerous statements during his deposition that suggest he was testifying based on what he saw on the video, rather than his independent recollection thereof. (Doc. 190, at 9) (citing Plaintiff Depo., Doc. 150, at 45, 46, 49, 57-58, 61, 66, 70). These exchanges show:

Q:     What evidence do you have to support your assertion that the officer . . . came to your house with an established intention to beat you?

A:     *The tape shows.*

\* \* \*

Q:     When you stood up and you were face to face with him, can you estimate the distance between your two bodies?

A:     No, I can't. *If we could see the tape we could do it*, I could tell you.

\* \* \*

Q:     Of course you didn't announce your intention to go into the house and get your phone?

A:     I don't remember that.

Q:     You didn't do that, did you?

A:     I just said I don't remember that.

Q:     Don't remember doing that?

A:     I - - *look at the tape and I could tell you*.

\* \* \*

Q:     Do you know when the strike with the flashlight occurred?

A:     That happened right before I got choked, pretty sure, because I already said it. Right when I get choked, *you can see me get choked*, and then - - well you can see like this right? Like right after he took me down, a little bit after that but before I got choked, because you can hear me say, you already hit me with it, and that's when he said I'll F-ing chuck you again - - or I'll F-ing hit you in the head.

Q:     Okay, so he didn't use - -

A:     That's a cop.

Q:     - - the word again did he?

A:     No, I'm sorry, He did not. No, he said I'm gonna F-ing hit you. If you don't, if you don't stop I'm gonna F-ing chuck you in the head is what he said.

Q:     And you know that based upon what you've heard on the video?

A:     Yes, ma'am.

Q:     But not because you remember it?

A:     At the moment I - - *I can't remember right now, but I'm pretty sure I probably remember everything about that night*.

Q:     Okay.

A:     Almost.

\* \* \*

Q:     Do you recall a third officer arriving at the scene?

A:     Well, I, when I was there, I mean, *you could hear* Vassie trying to talk to - - *you can hear in the tape* actually, Bunting at the very beginning and Bunting's like, you can't - - you're not interfering in this so. . . .

\* \* \*

18

A:      *You can see* the officer's knee in the side of my head, my brain just. [sic]

* * *

Q:      You were face to face with him?

A:      What do you mean, on the ground you mean?

Q:      Yeah, at the time that you were - -

A:      Well I'm laying, I'm laying like this. Actually, my head, *you can see in the video* my head is kinked on the, on the wall of the house. I mean I'm like, let's see. Lean this way. I was like this, I think. Like that or like that, I can't remember which way it was, but he had me kinked against the wall . . .

(Plaintiff Depo., Doc. 150, at 45, 46, 49, 57-58, 60-61, 66, 70) (emphasis added).

The Court reviewed Plaintiff's entire deposition and found numerous additional examples. *See id.* at 33 ("On the tape only. No, I didn't see that."); 41 (". . . and you can hear on the tape, you hear me say it and then I, I just - - when they asked me I started talking again. My brain's messed up."); 48 ("I'm not sure on that. I didn't look at the tape, but . . . "[a]ll I know is in my mind, I stood up to get a phone and I get attacked."); 51-52 ("If I remember right, well, you can see a, you can see - - he actually, before he choked me I got hit with the flashlight."); 54 ("You can see it plain as day, he's got his left hand choking me and I can't breathe . . ."); 55 ("I can't recall that. I don't, that wasn't - - I didn't look at that very well . . . . "); 56 ("Because if you notice he said . . . "); 59 ("Yeah, they asked – or he - - I heard him, well, on the tape, yeah.") 73 (". . . you can see his knee on my head"); 76 ("Yeah, you can hear him say let go of the flashlight, Johnnie, let go of the flashlight, and I, and I told him I'm not letting go of it . . ."); 80 ("I don't see me really fighting with them"). Moreover, Plaintiff repeatedly testified that he did not remember or did not recall specific details of the porch incident. *See id.* at 34, 49, 52-53, 55, 74, 75.

Although Plaintiff did file a response in opposition to the Health Defendants' motion to strike his affidavit, he did not file a response to the County Defendants' argument to strike. Given this prior testimony, the County Defendants' allegations as to lack of personal knowledge, and Plaintiff's lack of response, the Court finds Plaintiff has not offered a "persuasive justification for the contradiction", *Johnson*, 13 F.4th at 501, between his prior deposition testimony and how he can recall in his Declaration – in moment-by-moment detail – the circumstances of the incident on his porch based on his personal knowledge rather than his interpretation of what he saw on the video. *See Reich*, 945 F.3d at 976; *Yeager*, 693 F.3d at 1080; *Bryant*, 428 F. App'x at 897.

As such, the Court grants the County Defendants' request to strike Plaintiff's Affidavit as it relates to the incident on August 23, 2019 (paragraphs 1-32).

*Health Defendants*

The Health Defendants assert Plaintiff's affidavit should be stricken or disregarded because it "seeks to alter his testimony by ignoring his difficulty in recalling a significant amount of his 2019 incarceration, seeking to substitute 'new memories'" and that it "includes numerous statements regarding his medical status and diagnosis at the time of his incarceration, which he is not qualified to offer." (Doc. 182-1, at 4). The Health Defendants do not identify any specific portion of the Declaration to which they are referring, but rather refer to it generally. In response, Plaintiff contends that his Declaration does not contradict his deposition testimony and is therefore admissible. The Health Defendants repeat their argument in reply but cite by way of example Plaintiff's testimony that he did not remember his failure to provide answers to medical questions at booking, did not remember the details of the health appraisal conducted by the nurse, did not recall receiving medication to alleviate withdrawal symptoms, and did not recall

20

seven days having passed between his admission to jail and inquiring about Gabapentin. (Doc. 110, at 205-09). They do not cite any other purported contradictions. As to the one example cited, the Court will not consider anything in the Affidavit that contradicts Plaintiff's previous statement that he did not recall the health appraisal, receiving medication to treat withdrawal, or that he was in jail seven days before inquiring about Gabapentin. But the Court declines to strike the Affidavit in its entirety as the Health Defendants have not otherwise established that the testimony is inconsistent.

*Vassie Maharaj Declaration*

The County Defendants also ask the Court to disregard the February 7, 2022 Declaration of Vassie Maharaj, Plaintiff's stepfather. (Doc. 179-2). The Court denies the County's request as moot, finding Maharaj's testimony irrelevant to the issues presented for purposes of this summary judgment motion.

*Ronda Raifsnider Declaration*

The County Defendants also move to strike the declaration of Plaintiff's former girlfriend, Ronda Raifsnider, on the basis that it consists solely of hearsay and irrelevant information. The Court agrees with the rationale provided by the County Defendants and disregards Raifsnider's Declaration.

<u>Section 1983 Claims</u>

Plaintiff brings deliberate indifference and excessive force claims under 42 U.S.C. § 1983. Section 1983 makes liable "[e]very person" who "under color of" state law "subjects, or causes to be subjected," another person "to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]" 42 U.S.C. § 1983. "[A] § 1983 plaintiff generally must prove both that a defendant was *personally* at fault and that the defendant's culpable

conduct (not somebody else's) *caused* the injury." *Pineda v. Hamilton Cty.*, 977 F.3d 483, 490 (6th Cir. 2020). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) (plaintiff must prove "that the violation was committed *personally* by the defendant."). Thus, "in the face of [a] motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." *Pineda*, 977 F.3d at 491 (quoting *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018)).

*Qualified Immunity*

All individual Defendants raise the defense of qualified immunity in response to Plaintiff's claims. This doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity is an affirmative defense; once a defendant raises it, the burden shifts to the plaintiff to demonstrate: (1) the defendant's acts violated a constitutional right; and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct. *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014).

To defeat the qualified immunity defense, the plaintiff is required to plead facts demonstrating a violation of a constitutional right that is clearly established in a "particularized sense." *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015). That is, the right said to have

been violated must be defined "in light of the specific context of the case, not as a broad general proposition." *Id.* (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). In this context, "clearly established" means "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotations omitted)). "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Therefore, to overcome a qualified immunity defense, a plaintiff generally "must identify a case that put [the officers] on notice that [their] specific conduct was unlawful." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam). A case does not satisfy this notice requirement if its facts are "materially distinguishable" from the facts officers confronted. *Id.*

<u>Excessive Force</u>

 Plaintiff asserts Erie County Sheriff's Deputies Orzech and Bunting used excessive force in their interactions with him on August 23, 2019. Defendants present two arguments that they are entitled to summary judgment: first, that Plaintiff's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994); and second, that they are entitled to qualified immunity.

*Heck Bar*

The County Defendants assert Plaintiff's excessive force claim is barred by doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994). It is well settled under *Heck* that when an individual brings a § 1983 claim against an arresting officer, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." 512 U.S. at 487. If so, the claim is barred unless he proves that his

"conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.*

The Sixth Circuit has "recognized two circumstances under which an excessive force claim might conflict with a conviction." *Parvin v. Campbell*, 641 F. App'x 446, 449 (6th Cir. 2016). "The first is when the criminal provision makes the lack of excessive force an element of the crime." *Schreiber v. Moe,* 596 F.3d 323, 334 (6th Cir. 2010) (citing *Heck,* 512 U.S. at 486 n.6). "The second is when excessive force is an affirmative defense to the crime . . . ." *Id.* (citing *Cummings v. City of Akron,* 418 F.3d 676, 684 (6th Cir. 2005), for the proposition that "an assault conviction barred an excessive force claim because the plaintiff did not raise excessive force as a defense."). "In each of these circumstances, the § 1983 suit would 'seek[ ] a determination of a fact that, if true, would have precluded the conviction.'" *Parvin*, 641 F. App'x at 449 (quoting *Schreiber,* 596 F.3d at 334).

In other words, the question is whether this lawsuit could "be construed as seeking a judgment at odds with [Plaintiff's] conviction". *Muhammad v. Close,* 540 U.S. 749, 754-55 (2004); *see also Cummings*, 418 F.3d at 682-83 ("success on [the plaintiff's] excessive force claim would necessarily imply the invalidity of his state assault conviction" because "[t]he struggle between [the plaintiff] and the officers gave rise to both [the plaintiff's] assault conviction and the excessive force claim, and the two are inextricably intertwined."); *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 609 (6th Cir. 2014) ("[I]n this Circuit, if a plaintiff asserts a claim that contradicts an element of an underlying criminal offense, or if that claim could have been asserted in criminal court as an affirmative defense, *Heck* applies to bar the § 1983 suit."). In contrast, "[w]here there is room for the facts alleged by the plaintiff and the

facts essential to the [conviction] . . . to peacefully co-exist", a § 1983 excessive force claim can proceed. *Lockett v. Suardini*, 526 F.3d 866, 873 (6th Cir. 2008) (citations omitted).

The County Defendants assert Plaintiff's aggravated menacing conviction bars his excessive force claims because a finding of excessive force would necessarily imply that Plaintiff's actions – in threatening Bunting on the porch – were taken in self-defense, which contradicts his conviction. Plaintiff pled no contest to a charge of aggravated menacing in violation of Ohio Revised Code § 2903.21. (Doc. 168-5, at 10-19). That statute provides:

> No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family.

Ohio Rev. Code § 2903.21(A). Under Ohio law, a defendant may raise self-defense in response to an aggravated menacing charge. *State v. Ludt*, 180 Ohio App. 3d 672, 680 (Ohio Ct. App. 2009). "With respect to self-defense, a person is privileged to use only that force that is reasonably necessary to repel the attack." *Id.* (citing *State v. Williford*, 49 Ohio St. 3d 247, 249–50 (Ohio)).

The question here is thus whether a determination the Deputies used excessive force would necessarily imply the invalidity of Plaintiff's conviction for aggravated menacing. Plaintiff contends, in part, that Defendants have failed to satisfy their burden to support the allegation that Plaintiff's aggravated menacing conviction was based upon the statements Plaintiff made during his struggle with the officers on the porch, rather than the statements he made after he was handcuffed and on the lawn. *See Rogers v. Reed*, 2018 WL 4952484, at *4 (S.D. Ohio) ("Defendants have not attached Plaintiff's plea agreement or any other document outlining the allegations supporting Plaintiff's plea. Defendants reference the Serious Incident Reports . . ., but nothing in the record reflects that Plaintiff admitted the allegations contained in

25

these Reports or that the state-court judge relied upon the statements in the Reports to accept Plaintiff's guilty plea."). He also contends since he was already handcuffed and no force was being applied on the lawn, he could not have raised self-defense as to *those* statements.

Defendants respond that Plaintiff himself testified the plea/conviction was based upon statements made during the physical struggle. *See Colson v. City of Alcoa*, 458 F. Supp. 3d 887, 911 (E.D. Tenn. 2020), *rev'd on other grounds*, 37 F.4th 1182 (6th Cir. 2022) ("Because Plaintiff has admitted, in her sworn deposition testimony, that the conduct serving as the basis for her guilty plea to the charge of resisting arrest was her failure to return to the police car, the Court will accept this version of events.").

Plaintiff testified:

Q:   Okay. And it's my understanding, correct me if I'm wrong, that as a result of those charges you entered a plea of no contest and were convicted of the crime of aggravated menacing related to your conduct directed towards Deputy Bunting, which occurred on the front porch of your house on August 23rd, 2019.

A:   I got lost, I'm sorry.

Q:   Sure. It's my understanding that you entered a plea of no contest, true?

A:   Yes, ma'am, true.

Q:   And that as a result of that plea you were convicted of the crime of aggravated menacing, true?

A:   Aren't you always convicted on no plea, or no?

Q:   That's true, isn't it?

A:   Yes, that's true, yep.

Q:   And that related to your conduct directed toward Deputy Bunting which occurred on the front porch of your house on August 23, 2019, correct?

A:     About three, four minutes into getting beat, yes, I ran my mouth, I will say I did, and I am sorry for that, but the same time, I mean, they came over to my house and beat me.

\* \* \*

Q:     It's true you could have chosen to defend yourself against those charges, correct?

A:     I wasn't chancing five years with this system.

Q:     Okay, so for your own personal reasons you decided to enter the plea?

A:     Yes, Ma'am.

(Plaintiff Depo., Doc. 150, at 11-12).

Plaintiff points to testimony from Deputy Orzech that he asserts shows the basis for the charges was the threats made later, when Plaintiff was handcuffed and on the lawn. Specifically, he points to Orzech's testimony that Plaintiff was handcuffed for officer safety and was not considered to be under arrest until later. (Doc. 179, at 32) ("Deputy Orzech opined that Mr. Whyde was cuffed for officer safety, and that he made a threat which formed the basis for his arrest *after he was already cuffed and sitting in the grass waiting for the ambulance.*") (emphasis in original) (citing Orzech Depo., Doc. 152, at 42-52). Orzech's testimony regarding the basis for Plaintiff's arrest is specifically:

Q:     So at what point was he considered to be under arrest?

A:     When he threatened Dpty. Bunting?

Q:     And when was that?

A:     During the handcuffing the first time, and then while sitting on the front lawn waiting for the ambulance was the second time.

(Orzech Depo., Doc. 152, at 52). First, Orzech's testimony seemingly asserts both the porch threats and lawn threats were the basis for arrest. Second, and more importantly, Orzech's

27

testimony merely proves his subjective interpretation of when Plaintiff was under arrest, rather than the basis for the ultimate charges against Plaintiff, which Orzech testified was a determination made by the prosecutor. *See id.* at 27 ("I just want to make it aware that I did not approve these charges. It was the Prosecutor's Office . . ."). That is, Orzech's testimony does not speak directly to the basis for the charges or Plaintiff's no contest plea, whereas Plaintiff's testimony does so.

However, at least one court has found that aggravated menacing and excessive force are not necessarily so inextricably intertwined such that *Heck* bars the excessive force claim. *See Rogers v. Reed*, 2018 WL 4952484, at *4 (S.D. Ohio) ("Even assuming that Plaintiff's guilty plea was premised upon the verbal threats alleged in the Serious Incident Reports, Plaintiff's plea is not necessarily incompatible with his § 1983 excessive-force claim because success on this claim would not deprive his conviction for menacing and stalking of a factual basis. That is, it is possible that Plaintiff made verbal threats that violated Ohio Revised Code § 2903.211(A)(1) *and* that Defendants employed excessive force as Plaintiff alleges."), *report and recommendation adopted*, 2018 WL 5891683.

The *Heck* bar is more commonly applied to charges such as assault of an officer or resisting arrest. The Court is not persuaded that an aggravated mincing charge, even on the facts presented here, is so inextricably intertwined with the excessive force claims at issue so as to bar them. As such, the Court turns to the County Defendants' second argument.

*Qualified Immunity*

At the outset, the Court reiterates that on summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Even so, "[w]hen opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "[W]here, as here, there is 'a videotape capturing the events in question,' the court must 'view[ ] th[ose] facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (second alteration in *Green*) (quoting *Scott*, 550 U.S. at 378–81). However, where the video does not tell the whole story in a material respect, or "reasonable jurors could interpret the video evidence differently," summary judgment is not appropriate. *Id.* at 865.

Pretrial detainees are protected from the use of excessive force by the Fourteenth Amendment. *Phelps v. Coy*, 286 F.3d 295, 300 (6th Cir. 2002). To prevail on such a claim, a pretrial detainee must show "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). Whether the officer's conduct was objectively reasonable is a question of law for the Court. *See Standifer v. Lacon*, 587 F. App'x 919, 924 (6th Cir. 2014) ("[T]he question of whether [an officer's] conduct was "objectively reasonable" is a pure question of law for us, as judges, to decide[.]"); *Scott*, 550 U.S. at 381 & n.8 ("At the summary judgment stage, . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, . . . the reasonableness of [the officer's] actions . . . is a pure question of law."). In determining the reasonableness or unreasonableness of the force used, courts consider factors such as "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397.

Plaintiff identifies several actions during his interactions with the Deputies that he contends constitute excessive force. The Court evaluates each in turn. *See Hanson v. Madison Cty. Detention Ctr.*, 736 F. App'x 521, 529 (6th Cir. 2018) (in a case involving multiple uses of force, the court must assess the reasonableness of each use of force "in chronological 'segments.'") (quoting *Dickerson v. McClennan*, 101 F.3d 1151, 1162 (6th Cir. 1996)). "This approach requires [a reviewing court] to evaluate the use of force by focusing "on the 'split-second judgment' made immediately before the officer used allegedly excessive force," not on the poor planning or bad tactics that might have 'created the circumstances' that led to the use of force." *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019) (quoting *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007)); *see also Rucinski v. County of Oakland*, 655 F. App'x 338, 342 (6th Cir. 2016) ("[W]e are required to . . . focus[ ] on the moments immediately preceding th[e] use of force[.]"). Further, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Because Defendants have asserted qualified immunity, it is Plaintiff's burden to demonstrate the right violated was clearly established at the time of each individual Defendant's alleged misconduct. *See T.S.*, 742 F.3d at 635.

*The Initial Push (Bunting)*

Plaintiff contends Bunting's action pushing him back into the chair was an act of excessive force. He contends no force was needed, and Bunting "could have easily stepped back if he felt threatened by Mr. Whyde's act of standing up." (Doc. 179, at 36).

But "[t]he Fourth Amendment . . . does not require police officers to take the better approach. It requires only that they take a reasonable approach." *Cook v. Bastin*, 590 F. App'x

523, 528 (6th Cir. 2014); *see also Siders v. City of Eastpointe*, 819 F. App'x 381, 389 (6th Cir. 2020) (even though officer could have taken different actions, "he was not constitutionally required to do so"). And Plaintiff has certainly cited no clearly established caselaw that an officer has a duty to step back in such a situation.

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97; *see also Reich*, 945 F.3d at 978 (a court is required "to evaluate the use of force by focusing "on the 'split-second judgment' made immediately before the officer used allegedly excessive force," not on the poor planning or bad tactics that might have 'created the circumstances' that led to the use of force.") (quoting *Livermore ex rel. Rohm*, 476 F.3d at 406).

Plaintiff cites *Monday v. Oulette*, 118 F.3d 1099, 1104 (6th Cir. 1997), and *Degolia v. Kenton Cnty.*, 381 F. Supp. 3d 740 (E.D. Ky. 2019) for the proposition that "[w]hen no force is necessary, any force is excessive." (Doc. 179, at 35). In *Monday*, police responded to a potentially suicidal individual, and observed an intoxicated individual with missing Xanax pills. 118 F.3d at 1102. Because the individual was uncooperative with the officer's attempts to persuade him to go to the hospital, the officer eventually deployed pepper spray while the individual sat on his couch. *Id.* at 1104. The Sixth Circuit held these actions were not excessive force: "Although Oullette did not suspect plaintiff of having committed a crime, he had reason to believe that the potential consequences of inaction would be serious. Further, and after many minutes of fruitless discussion, Oullette warned plaintiff that he would spray him if he did not agree to go to the hospital. The decision by Oullette to act on his warning, rather than risk injury and further delay through a physical confrontation with a large and intoxicated person, did not

constitute excessive force." *Id.* at 1104-05. In *Degolia*, where the plaintiff was in a booking room "sitting in a chair with his arms folded when [the officer] approached from behind and almost instantaneously grabbed [the plaintiff] in a headlock-type chokehold, threw him to the floor, held him in a one-armed chokehold, and then immediately struck him repeatedly in the head", the court found the force used objectively unreasonable. 381 F. Supp. 3d at 760-61. This was because it was undisputed Plaintiff's actions did not present a danger or "active resistance". *See id.* at 764 ("'The key point, . . . is whether there was some real form of resistance or danger.' Neither is present here and no reasonable officer on the scene could believe otherwise.") (quoting *Jennings v. Fuller*, 659 F. App'x 867, 870 (6th Cir. 2016)).

By contrast here, the officers had responded to reports of a physical domestic assault, observed scratches on Plaintiff's body, and Plaintiff was intoxicated and verbally aggressive in response to questioning about that reported assault. In these circumstances, when Plaintiff abruptly arose from a chair, a reasonable officer could have assumed Plaintiff was a safety threat and was about to be physically violent. *Cf.*, *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 96 (6th Cir. 2012) ("While it is true that Plaintiff was not being arrested for a crime, his consumption of a large quantity of alcohol and drugs, his erratic behavior, and his self-proclaimed desire to provoke the officers into using deadly force could lead reasonable officers to conclude that he was a threat to officer safety."). Although Plaintiff contends he simply stood up and intended to get his phone, the video reflects that he stood up suddenly, and did not inform the officers of his intentions. Officer Bunting's split-second decision to push him was not objectively unreasonable.

The Court finds Officer Bunting did not commit a constitutional violation with the initial push. As such, he is entitled to qualified immunity and summary judgment as to the push.

*Force on the Ground*

Plaintiff next contends that even if the initial push was reasonable, any force that followed was excessive because he no longer posed a threat. He contends that at this point, he "was neutralized and harmlessly seated on the ground." (Doc. 179, at 39). But courts must balance "the government's interest in preventing crime and protecting the public and the officers against a suspect's interest in avoiding injury" when deciding whether an officer used excessive force. *See Gambrel v. Knox Cnty.*, 25 F.4th 391, 400 (6th Cir. 2022). And again, the Court looks to three factors to determine whether, in the totality-of-the-circumstances, force was reasonable: (1) "whether the officers were investigating a serious crime;" (2) "whether the suspect posed a safety threat"; and (3) "whether the suspect was resisting arrest." *Id.*

The first and second factors weigh against Plaintiff. The officers were told they were responding to a physical domestic violence situation – a serious crime – and Plaintiff was argumentative, and then abruptly arose from a chair after officers observed scratches on his body and observed him to be intoxicated. These factors did not evaporate simply because Officer Bunting pushed Plaintiff away after he abruptly stood.

Plaintiff further contends he was not resisting the officer's actions, but his body was moving simply because he was reacting to pain. In support, he cites several cases for the proposition that "minimal, and possibly involuntary movement" does not justify the use of force. *See* Doc. 179, at 44. But these cases involve factual circumstances materially distinguishable from those at issue here. In *Cannon v. Licking County*, the plaintiff had placed her hands behind her back to be handcuffed and indicated she intended to surrender, then flinched in reaction to being handcuffed; an officer performed a takedown maneuver. 2019 WL 2567732, at *8 (S.D. Ohio). In *Aldrich v. City of Columbus*, the plaintiff had merely "tensed up" after an officer

33

grabbed the plaintiff to escort him to the car; the officer then performed an arm bar takedown maneuver. 2016 WL 6084570, at *6 (S.D. Ohio). And in *McCaig v. Raber*, the plaintiff jerked away from an officer who yelled in his ear; the officer performed a takedown. 2012 WL 1032699, at *3 (W.D. Mich.), *aff'd*, 515 F. App'x 551 (6th Cir. 2013) ("There is a question of fact as to whether an officer in Defendant's position would have reasonably perceived Plaintiff's action as resistance as opposed to a natural reaction to a sudden loud noise.").

In contrast to these cases, the video demonstrates Plaintiff here had abruptly arisen out of his chair, and when officers tried to get control of his arms, he pulled his arms away, grabbed the window ledge, yelled various threats, and grabbed Officer Bunting's flashlight. Thus, the Court finds there is no genuine issue of material fact as to whether a reasonable officer at the scene would have perceived Plaintiff's ongoing actions to bear the hallmarks of a potential threat to officer safety.

With this background, the Court therefore turns to each individual action Plaintiff alleges to be excessive force.

### Choking

Plaintiff contends Deputy Bunting used excessive force in "choking" him. In the light most favorable to Plaintiff, the video reflects that Deputy Bunting's hand went to Plaintiff's neck seconds after the push and remained there for approximately 25 seconds, Mr. Maharaj perceived Bunting to be choking Plaintiff, and Plaintiff testified he could not breathe for 15 seconds. On the video, at 2:25-2:26, Plaintiff can be clearly heard saying "You want to hit me?" and at 2:41 he can be heard breathing heavily and then at 2:42, he says "video it."

Because Defendants have asserted qualified immunity, even assuming *arguendo* a constitutional violation, the question thus becomes whether Plaintiff has presented evidence that

"at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (quoting *al-Kidd*, 563 U.S. at 735) (internal quotations omitted)). Plaintiff contends again that he was "neutralized" at this point and thus no force at all was necessary, and the choking was necessarily excessive. For this proposition – that "an officer cannot continue to apply serious force when the threat has subsided" (Doc. 179, at 42) – he cites *Malory v. Whiting*, 489 F. App'x 78 (6th Cir. 2012); *Alicea v. Thomas*, 815 F.3d 283 (7th Cir. 2016); *Lamont v. New Jersey*, 637 F.3d 177 (3d Cir. 2011); and *Lytle v. Bexar Cnty.*, 560 F.3d 404 (5th Cir. 2009).

Plaintiff also correctly cites *Coley v. Lucas County* and other cases for the proposition that it is clearly established that chokeholds are unconstitutional if used on an *unresisting* subject. 799 F.3d 550, 540-41 (6th Cir. 2015) ("Chokeholds are objectively unreasonable where an individual is already restrained or there is no danger to others."); *see also Griffith v. Coburn*, 473 F.3d 650, 649-50 (6th Cir. 2007) ("When the facts in this case are viewed in the light most favorable to the plaintiff, it is clear that Partee posed no threat to the officers or anyone else. It follows that the use of the neck restraint in such circumstances violates a clearly established constitutional right to be free from gratuitous violence during arrest and is obviously inconsistent with a general prohibition on excessive force.").

In contrast to the above cases, however, in light of the video, the Court finds there is no genuine issue of material fact regarding whether Plaintiff continued to present a safety risk at the time of the action identified. The Court finds a reasonable officer at the scene would still have perceived Plaintiff – given his demeanor, intoxication, and prior actions – to be a safety threat even after the push. And Plaintiff has pointed to no case demonstrating "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would

understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (quoting *al-Kidd*, 563 U.S. at 735) (internal quotations omitted)).

As such, the Court finds Bunting is entitled to qualified immunity on Plaintiff's claim regarding the choking.

### *Flashlight*

Next, Plaintiff asserts Deputy Bunting used excessive force by striking him with his flashlight. The video does not clearly depict what happened with the flashlight, but taking the facts in the light most favorable to Plaintiff, Deputy Bunting struck Plaintiff once on the head with his flashlight shortly after prying Plaintiff's hand from the window ledge.

First, "[n]ot every push or shove [by a police officer], even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (quoting *Graham*, 490 U.S. at 396).

Second, even if the flashlight strike were a constitutional violation, Plaintiff has presented no clearly established caselaw that a single such blow to a subject who presents a safety risk or is resisting officer is unconstitutional. *Cf., e.g., Schroeder v. Cnty. of Nassau*, 158 F. Supp. 3d 123, 129 (E.D.N.Y. 2016) ("Viewing the facts most favorably to the plaintiff, it is not . . . sufficiently clear that every reasonable officer in Nielsen's position would have understood that hitting the fleeing plaintiff in the head with a baton was unconstitutional in this specific context. Indeed, based on the case law provided by the parties, there appears to be a dearth of decisions at any federal level involving facts sufficiently similar to those faced by Nielsen to provide guidance as to the unconstitutionality, if such be the case, of the officer's conduct.") (internal quotation and citation omitted). Again, Plaintiff seeks to rely on cases involving individuals who posed no threat to officers or who were not resisting officers' actions. Those are materially distinguishable

from the facts presented here, even viewed in the light most favorable to Plaintiff. As such, Deputy Bunting is entitled to qualified immunity and summary judgment on this claim.

### Pressure on Head, Teeth

Next, Plaintiff asserts that Deputy Bunting applied excessive force by pressing his knee into Plaintiff's temple, pressing Plaintiff's teeth against the metal bar of the lawn chair after he was on his stomach, and pressing his elbow into Plaintiff's head and neck behind his ear. Defendants respond that these actions were merely incidental contact consistent with an effort to neutralize and handcuff a resisting subject.

The video depicts that Bunting's knee came into contact with Plaintiff's left temple very briefly (for less than two seconds) mere seconds after Plaintiff had threatened to kill Deputy Bunting and been ordered to let go of the flashlight. Moreover, Plaintiff's verbal threats against Deputy Bunting continued during the handcuffing process. The video further depicts Plaintiff yelling about pain related to his teeth and ear at various points.

"The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Some use of force in order to subdue a resisting subject is not objectively unreasonable. *See Goodrich v. Everett*, 193 F. App'x 551, 556 (6th Cir. 2006) (finding that where officers' "kneeing and kicking occurred not when Goodrich was neutralized, but while the officers were handcuffing him", force used was objectively reasonable); *Bozung v. Rawson*, 439 F. App'x 513, 521 (6th Cir. 2011) (finding officer's placement of a knee on subject's back to effectuate handcuffing objectively reasonable). Further, as Defendants point out, the Sixth Circuit found officers did not violate a suspect's "constitutional rights when they forced a drunk suspect . . .

into a submissive posture in order to handcuff him behind his back so as to immobilize his hands and arms." *Marvin v. City of Taylor*, 509 F.3d 234, 247 (6th Cir. 2007).

*Malory v. Whiting*, cited by Plaintiff, is distinguishable. There, a booking officer "slammed Plaintiff to the ground and drove his knee into Plaintiff's temple" while another officer "stepped on Plaintiff's hand and punched him in the ribs" where a video recording "demonstrate[d] little more than Plaintiff's show of discomfort when Whiting lifted his ankle and bent it behind his thigh." 489 F. App'x 78, 84 (6th Cir. 2012). The Court found that "his resistance toward Defendants at the booking counter was sufficiently benign that a reasonable officer would have understood that it was unnecessary to tackle, step on, and punch Plaintiff to prevent him from acting violently toward the officers" and the plaintiff "was subdued and presented no danger to Defendants when Defendants used violent physical force against him." *Id.* at 86.

Here, Plaintiff had presented both physical and verbal resistance to the officers during the ongoing struggle. Plaintiff was not yet in handcuffs. Given the totality of the circumstances, the officers had reason to believe Plaintiff continued to be a safety risk and were entitled to use some force to handcuff him. Again, "[n]ot every push or shove [by a police officer], even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Kostrzewa*, 247 F.3d at 639 (6th Cir. 2001) (quoting *Graham*, 490 U.S. at 396).

As such, the Court finds Officer Bunting did not commit a constitutional violation either in the brief knee-to-temple contact, or in his use of force keeping Plaintiff restrained on the porch while he and Orzech secured Plaintiff in handcuffs.

*Orzech's Actions*

In his opposition brief, Plaintiff contends Orzech "restrained [Plaintiff's] arm and assisted Bunting by holding [Plaintiff] on the floor so Bunting could choke, hit, abuse and maliciously inflict pain on him." (Doc. 179, at 46).

Defendants have presented evidence in the form of Orzech's testimony that his actions were taken to "attempt[] to get [Plaintiff] in handcuffs for Officer safety" (Orzech Depo., Doc. 152, at 28) as well as video depicting the at-issue actions. Plaintiff, in response, offers only an argument as to his subjective belief as to Orzech's intentions. The Court finds no reasonable jury presented with this evidence could conclude that Orzech's actions were not objectively reasonable. As such, Orzech is entitled to summary judgment on Plaintiff's claim that he used excessive force.

*Failure to Intervene (Orzech)*

Plaintiff further contends Orzech is liable for failing to intervene to stop Bunting's acts. "Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

This claim is derivative of Plaintiff's claim against Deputy Bunting. But no duty to intervene arises if there is no unconstitutional use of force. *Holland v. Cnty. of Macomb*, 2017 WL 3391653, at *3 (6th Cir.) (citing *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004)); *see also Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 413 (6th Cir. 2015) (an officer cannot be liable for failing to intervene if there is no constitutional violation). Because the Court finds

Deputy Bunting did not commit a constitutional violation, the failure to intervene claim against

Deputy Orzech must also be dismissed.[7]

*Monell Claims*

The County Defendants also move for summary judgment on Plaintiff's *Monell* liability

claim. (Doc. 168-1, at 44-46). In response, Plaintiff asserts a municipal liability claim based on

ratification, contending that the internal investigation conducted by the Sheriff's Office was

inadequate. (Doc. 179, at 48-50).[8]

Plaintiff relies on *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989) and

*Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985) to support his claim that the inadequate

investigation and failure to discipline in these circumstances constitutes ratification, upon which

---

7. Even assuming, *arguendo*, Bunting had committed a constitutional violation, Orzech would still not be liable for failure to intervene. Both the initial push and the flashlight incident were split-second, discrete acts. *See Pennington v. Terry*, 644 F. App'x 533, 548 (6th Cir. 2016) (noting there is generally insufficient time to intervene in excessive force lasting less than ten seconds); *see also Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (holding that an officer and nurse lacked opportunity to intercede in a takedown that lasted no more than ten seconds). Further, the Sixth Circuit has found fellow officers not liable for failure to intervene when the other officers were not "in the position to prevent" a tasing because those officers "were actively involved in the struggle to bring [the individual] under control at that time and that their solitary focus, at that time, was achieving that goal." *Sheffey v. City of Covington*, 564 F. App'x 783, 793–94 (6th Cir. 2014) ("The physical struggle to bring Mr. Hughes under control also would have kept Officers Allen and Bohman from preventing the tasings, as they were otherwise engaged at the time."). The same is true here for Officer Orzech, who was acting in conjunction with Officer Bunting to secure Plaintiff in handcuffs. The caselaw Plaintiff relies upon – *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982) – is distinguishable on that basis.

8. In his Third Amended Complaint, Plaintiff asserted a *Monell* claim based on several theories of liability. *See* Doc. 74, at ¶ 119 (asserting "policies, practices, customs, and usages", failure to train, and ratification). In Reply, the County Defendants assert that Plaintiff has abandoned any *Monell* liability claim based on an unconstitutional policy or failure to train, but that he now only argues municipal liability based upon the Sheriff "ratifying" the Deputies' conduct through an inadequate internal investigation. The Court agrees. *See Palma v. Johns*, 27 F.4th 419, 429 n.1 (6th Cir. 2022) ("Generally, at the summary judgment stage, the non-moving party can forfeit an argument if they fail to respond to the moving party's arguments."); *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

liability can be based. But "[s]ince *Leach* and *Marchese*, however, [the Sixth Circuit has] clarified the scope of this 'ratification' theory in a way that dooms [Plaintiff's] claim in this case." *Pineda*, 977 F.3d at 495. The Sixth Circuit explained that "[b]ecause municipal liability requires an unconstitutional 'policy' or 'custom,' we have held that an allegation of a *single* failure to investigate a single plaintiff's claim does not suffice." *Id.* (citing *See Burgess v. Fischer*, 735 F.3d 462, 478–79 (6th Cir. 2013); *Thomas v. City of Chattanooga*, 398 F.3d 426, 433–34 (6th Cir. 2005)). Therefore, "a claim based on inadequate investigation" requires "not only an inadequate investigation in this instance," but also "a clear and persistent pattern of violations" in earlier instances. *David v. City of Bellevue*, 706 F. App'x 847, 853 (6th Cir. 2017). That is, "there must be multiple earlier inadequate investigations and they must concern comparable claims." *Stewart v. City of Memphis*, 788 F. App'x 341, 344 (6th Cir. 2019).

Because Plaintiff attacks only the investigation in the instant case and has not presented "a clear and persistent pattern" of inadequate investigation, his ratification theory *Monell* claim necessarily fails. The Sheriff and County are entitled to summary judgment on this claim.

<u>Deliberate Indifference</u>

All Defendants assert they are entitled to qualified immunity, and summary judgment, on Plaintiff's deliberate indifference claims. Plaintiff asserts the Defendants acted with deliberate indifference to his medical needs during his time at the Erie County Jail by: (1) implementing a withdrawal protocol rather than providing his previously-prescribed medication, (2) failing to dispense his prescribed medication, "or to provide him with substitute medication or treatment to sufficiently address his pain and withdrawal"; (3) failure to "arrange for emergency treatment or 10-minute monitoring with stimuli reduction when [Plaintiff] was suffering from severe

migraines"; (4) delaying treatment or failing to arrange for Plaintiff to see the jail physician contingent upon his signing a medical release. *See* Doc. 177, at 12, 21-22.

The Eighth Amendment prohibits cruel and unusual punishments, U.S. Const. amend. VIII, and "includes a right to be free from deliberate indifference to an inmate's serious medical needs". *Brawner v. Scott Cnty.*, 14 F. 4th 585, 591 (6th Cir. 2021). "But the Eighth Amendment does not apply to pretrial detainees" like Plaintiff who "[i]nstead . . . have a constitutional right to be free from deliberate indifference to serious medical needs under the Due Process Clause of the Fourteenth Amendment." *Greene v. Crawford Cnty.*, 22 F.4th 593, 605 (6th Cir. 2022). As a pretrial detainee, Plaintiff's "due process rights to medical care 'are at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Griffith v. Franklin Cnty.*, 975 F.3d 554, 566 (6th Cir. 2020) (quoting *City of Revere v. Mass Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

Until recently, Fourteenth Amendment and Eighth Amendment deliberate indifference claims were analyzed "under the same rubric". *Brawner*, 14 F. 4th at 591 (internal quotation and citation omitted). The Eighth Amendment framework for deliberate indifference claims includes an objective and subjective component. *Griffith*, 975 F.3d at 566. "The objective component requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the [Constitution]." *Id.* at 567 (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018)). A sufficiently serious medical need "is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore*, 390 F.3d at 897). The subjective component requires a plaintiff to show that "each defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk by failing to take

reasonable measures to abate it." *Id.* at 568 (quoting *Rhinehart*, 894 F.3d at 738). This is a high standard of culpability, "equivalent to criminal recklessness." *Id.*

The Sixth Circuit's majority opinion in *Brawner* "changed things." *Greene*, 22 F.4th at 606. There, the Sixth Circuit found that "*Kingsley* [*v. Hendrickson*, 576 U.S. 389 (2015)]'s reasoning required 'modification of the subjective prong of the deliberate-indifference test for pretrial detainees.'" *Id.* (quoting *Brawner*, 14 F.4th at 596). Therefore, the Court held to satisfy the "subjective prong" of a deliberate indifference claim, "[a] pretrial detainee must prove 'more than negligence but less than subjective intent—something akin to reckless disregard." *Brawner*, 14 F.4th at 597 (internal quotation and citation omitted). "In other words, a plaintiff must prove the defendant acted 'deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Greene*, 22 F.4th at 607 (quoting *Brawner*, 14 F.4th at 597). "Mere negligence", however, remains "insufficient." *Brawner*, 14 F.4th at 596; *see also Britt v. Hamilton Cnty.*, 2022 WL 405847, at *3 (6th Cir.).

Therefore, to survive summary judgment on a deliberate indifference claim, *Brawner* explained a plaintiff must "present evidence from which a reasonable jury could find that (1) that [the detainee] had an objectively serious medical need; and (2) that [the defendant's] action (or lack of action) was intentional (not accidental) and she either (a) acted intentionally to ignore [the detainee's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to" the detainee. *Brawner*, 14 F.4th at 597. But "the post-*Brawner* deliberate indifference inquiry still requires consideration of an official's actual knowledge of the relevant circumstances." *Trozzi v. Lake Cty.*, 29 F.4th 745, 755 (6th Cir. 2022). In *Trozzi*, the Sixth Circuit summarized the standard as follows:

43

> [A] plaintiff must satisfy three elements for an inadequate-medical-care claim under the Fourteenth Amendment: (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk.

*Id.* at 757-58. Importantly, this standard still "ensur[es] that there is a sufficiently culpable mental state to satisfy the 'high bar' for constitutional torts grounded in a substantive due process violation." *Id.* And it remains true that the Court "cannot 'impute knowledge from one defendant to another[,]' [rather it] must 'evaluate each defendant individually[.]'" *Greene*, 22 F.4th at 608 (quoting *Speers v. County of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006)); *see also Trozzi*, 29 F.4th at 758 (evaluating "how the modified deliberate-indifference test applies to each defendant").

The Health Defendants have again asserted the defense of qualified immunity, which means Plaintiff "must identify a case that put [the defendants] on notice that [their] specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8. A case does not satisfy this notice requirement if its facts are "materially distinguishable" from the facts confronted. *Id.*

*Withdrawal Protocol*

Plaintiff asserts that implementing a withdrawal protocol, rather than providing Plaintiff with his prescribed Methadone, Oxycodone, or Gabapentin, constituted deliberate indifference. But Plaintiff has not pointed to clearly established law that would inform Defendants that the use of a withdrawal protocol, or prohibition of certain medications, is unconstitutional.

Plaintiff cites *Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991) and *Richmond v. Huq*, 885 F.3d 928 (6th Cir. 2018) as providing that the failure to provide prescribed treatment can be a constitutional violation. In *Boretti,* the plaintiff had been treated for a gunshot wound three

weeks prior to coming to the jail and had been given a treatment plan, which included daily changing of his bandages and daily provision of Motrin. 930 F.2d at 1151. Despite the existence of the plan, plaintiff never received any pain medication nor were his bandages changed and there was evidence the defendant nurse refused to do so. *Id.* at 1152. The court therefore held there was an issue of material fact as to whether the nurse "wantonly interrupted a prescribed plan of treatment." *Id.* at 1156.

In *Richmond*, the Sixth Circuit found it was clearly established that "neglecting to provide a prisoner with needed medication, intentionally scrubbing her wound to cause unnecessary pain, and failing implement the prescribed plan of treatment could constitute a constitutional violation." 885 F.3d at 948. There, a doctor was aware Plaintiff had been taking psychiatric medication and failed to take any action "such as prescribing them herself or even simply requesting that a nurse check with Richmond's outside doctor or pharmacy to verify her prior prescriptions", factual issues precluded summary judgment. *Id.* at 941-42.

Neither of these cases deals with prescription narcotic pain medication prescribed prior to being booked into a jail or with the considerations that come into play with narcotic pain medication in a prison setting. Nor does either address where a substitute treatment plan is developed upon an inmate's admission to a jail.

Moreover, the Sixth Circuit "distinguish[es] between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment," such that where medical care is merely inadequate, [the] Court is "generally reluctant to second guess medical judgments." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake*, 537 F.2d at 860 n.5). Nevertheless, it is true that

treatment may be constitutionally impermissible when it is "so woefully inadequate as to amount to no treatment at all." *Id.*

The Court finds the caselaw cited by Plaintiff does not clearly establish that failing to provide previously prescribed narcotic pain medication or migraine medication, without more, constitutes a constitutional violation, particularly where a substitute treatment plan is provided. *See Shiira v. Hawaii*, 706 F. App'x 436, 437 (9th Cir. 2017) ("By itself, a failure to administer narcotic pain medication does not constitute a constitutional violation, particularly where, as here, both over-the-counter pain medication and treatment for potential detoxification symptoms are offered.") (finding no constitutional violation in denying previously-prescribed Methadone and Percodan where "the medical records indicate that none of the Defendants observed [the plaintiff] to be suffering to the extent that he claims" and there was no evidence "the Defendant nurses personally witnessed his severe pain and ignored it.").

As this Court previously held with respect to Plaintiff's 2017 claims, Plaintiff has not presented evidence that "at the time of [Health Defendants'] conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing" – prescribing an opiate withdrawal protocol rather than continuing Plaintiff's prescriptions – "is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotations omitted). The same is true here. Thus, the Court finds the Health Defendants are entitled to qualified immunity as to Plaintiff's claim that not providing certain medications in the jail is unconstitutional.

Further, the Court finds Plaintiff has not demonstrated a genuine issue of material fact regarding the treatment of his withdrawal. Although Plaintiff notes, correctly, that "[w]ithdrawal symptoms qualify as a serious medical need" (Doc. 177, at 15) (quoting *French v. Daviess Cnty.*, 376 F. App'x 519, 522 (6th Cir. 2010)), he has not presented evidence to create a factual issue

that any individual defendant "at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and . . . the [health provider] knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk." *Trozzi*, 29 F.4th at 757-58. Plaintiff points to evidence, in the form of his Declaration, that he suffered from nausea, sweating and diarrhea as a result of withdrawal and "[t]hese symptoms were the most severe for the first several days, but continued throughout [his] approximately 24-day stay in the jail." (Doc. 177-2, at ¶ 36). Even taking this as true, Plaintiff has not pointed to evidence that any individual Defendant was, or should have been, aware of these continued symptoms and was deliberately indifferent thereto.

*Underlying Pain / Substitute Pain Medication*

Plaintiff relatedly asserts the Health Defendants acted with deliberate indifference by failing to adequately treat his pain and migraines after placing him on the withdrawal protocol. In the light most favorable to Plaintiff, the Health Defendants were aware that upon admission to the jail, Plaintiff reported a 2017 head injury, 2014 knee injuries; they were further aware that he was taking several pain medications, and that he requested medications throughout his stay (specifically Gabapentin and Zomig). Plaintiff's opposition brief in large part addresses "Defendants" liability collectively, rather than individually. But, "in the face of [a] motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." *Pineda*, 977 F.3d at 491 (quoting *Jutrowski*, 904 F.3d at 291). The Court therefore evaluates each individual Defendant in turn.

*Nurse Hartson*

Nurse Hartson interacted with Plaintiff several times between August 27 and September 7. On August 27, she verified Plaintiff's medications with his pharmacy. (Doc. 161-1, at 2). On August 28, she noted Plaintiff complained of blurry vision; she instructed him to notify medical if it got worse. *Id.* Later that day, she observed Plaintiff playing basketball and noted he did not appear to be having any issues with blurred vision "as he was catching or throwing the ball." *Id.* On August 30, Plaintiff asked Nurse Hartson for Gabapentin and she told him it was not provided in the jail. *Id.* at 2-3. On September 4, Hartson documented Plaintiff "inquired again about his [G]abapentin and [Z]omig" as well as complained he had not seen a doctor. *Id.* at 3. She wrote that she "informed him that there were not any changes to his medications" and that migraine medications were not provided in the jail. *Id.* He then requested Tylenol, and Nurse Hartson provided it. *Id.* Finally, Nurse Hartson interacted with Plaintiff three times on September 7. *Id.* at 4. Plaintiff complained of pain from a head injury; Nurse Hartson responded by telling him that if the jail could receive Plaintiff's medical records, she could provide them to the doctor and see if there was anything that could be done. *Id.* She then followed up by bringing Plaintiff a records release in the afternoon and again in the evening. *Id.* Plaintiff did not sign the release, saying his lawyer had told him not to. *Id.* Plaintiff then requested Tylenol, and Nurse Hartson informed him it was not offered at night. *Id.*

The Court finds Plaintiff has not created a genuine issue of material fact about whether a reasonable nurse in Nurse Hartson's position "would have understood that [Plaintiff's] medical needs subjected [him] to an excessive risk of harm" or "knew that [her] failure to respond would pose a serious risk to [Plaintiff] and ignored that risk." *Trozzi*, 29 F.4th at 757-58. Rather, the undisputed facts show Nurse Hartson took affirmative steps to address Plaintiff's complaints. *See*

*id.* at 759 ("Either way, Stakich did not *ignore* Trozzi. Far from it, in fact. Stakich took affirmative actions to help Trozzi . . .. Perhaps Stakich should have pursued more serious intervention. At most, that failing amounts to negligence. Far more is required to establish a constitutional violation.").

The facts further do not show a reasonable person in Nurse Hartson's position would have known Plaintiff's pain was so severe that denying his request for medication posed an excessive risk of harm.[9] Could she have done more, such as inquiring further as to why he wanted Gabapentin, or offered alternative migraine-alleviating treatment, or arranging for Plaintiff to see the jail physician? Certainly. But deliberate indifference requires more than a showing of negligence, or even medical malpractice. The same is true as to the denial of Tylenol when Plaintiff requested it on September 7. *See, e.g., Loukas v. Gundy*, 70 F. App'x 245 (6th Cir. 2003) (no constitutional violation where plaintiff suffered walking on a fractured foot bone for 24 days before receiving any pain medication); *Warman v. Funk*, 119 F. App'x 789, 791 (7th Cir. 2004) (ten-day delay in filling a pain medication prescription did not establish deliberate indifference).

Even assuming a constitutional violation *arguendo*, Plaintiff has not pointed to clearly established law to the contrary that would have put Nurse Hartson on notice that any of her specific actions were unconstitutional. As such, Nurse Hartson is entitled to summary judgment.

---

9. Indeed, although Plaintiff describes his pain in his Declaration ("I suffered from a constant throbbing pain in my back, left leg, ankle and knees continuously during my incarceration"; "I was suffering from severe migraines at least twice a week while in the jail"; "When I did receive the acetaminophen, it provided very limited relief" (Doc. 177-2)), he has not pointed out to the Court to evidence suggesting any particular individual Defendant was or should have been aware of the severity of the pain which he alleges or that the provided medication was so insufficient it subjected Plaintiff "to an excessive risk of harm". *Trozzi*, 29 F.4th at 757-58.

*Nurse Faulkner*

Nurse Faulkner performed the initial health assessment of Plaintiff upon booking on August 24. (Doc. 161-1, at 1); (Doc. 161-4). She started him on the jail's withdrawal protocol on August 25 and provided Gatorade, Maalox, and Tylenol. (Doc. 161-1, at 1). She checked his vital signs several times.

Nurse Faulkner's next contact was with Plaintiff's mother on September 11, who called to complain that Plaintiff was suffering severe headaches and not receiving appropriate treatment. *Id.* at 4-5. Nurse Faulkner documented she told her Plaintiff had been "on [the] doctor board 8/28, 9/4, [and] 9/11" but that he had refused to sign a records release. *Id.* at 5.[10] On September 13, Nurse Faulkner noted Plaintiff's complaints that he was in pain and not being provided pain medication. *Id.* She told him she would have no further discussion regarding medications passed at the facility and told him the doctor was "at a stand still [without] any further information or health history." *Id.* Later that day, Plaintiff told Nurse Faulkner that he would let her call his pharmacy and would sign a release for the pharmacy only. *Id.* at 6. Nurse Faulkner informed Plaintiff if he wanted to speak to a doctor, they needed his health history. *Id.*

As with Nurse Hartson, the Court finds Plaintiff has not created a genuine issue of material fact about whether a reasonable nurse in Nurse Faulkner's position "would have understood that [Plaintiff's] medical needs subjected [him] to an excessive risk of harm" or "knew that [her] failure to respond would pose a serious risk to [Plaintiff] and ignored that risk." *Trozzi*, 29 F.4th at 757-58. Although the contact with Plaintiff's mother would certainly have informed Faulkner that Plaintiff was suffering from migraines, again, at this point, Plaintiff had refused to sign the records release he had been told was necessary to obtain his health history.

---

10. As Plaintiff points out, this appears to contradict the inmate progress notes, which indicate Plaintiff was first asked to sign such a release on September 7, 2019. *See* Doc. 161-1, at 4.

Like Nurse Hartson, Nurse Faulkner could have done more, such as insisted the jail physician see Plaintiff, offered alternative migraine treatment, or presented Plaintiff with a pharmacy release to attempt to confirm his Zomig prescription. But the Court cannot find that her failure to do so, given when she knew, was reckless or constitutes deliberate indifference. And again, assuming *arguendo* any of Nurse Faulkner actions rise to the level of a constitutional violation, Plaintiff has not presented clearly established caselaw informing her that her specific actions were unconstitutional.

*Nurse Olinger*

Nurse Olinger noted the verification of Plaintiff's medications on August 26. (Doc. 161-1, at 2). Her next note was on September 5, when she observed Plaintiff complained of not having pain medication for migraines, and he "needs his Gabapentin." *Id.* at 3. She informed Plaintiff those medications were "not passed here" and documented that he "[d]id not want Tylenol." *Id.* On September 14, Plaintiff asked Olinger for "a copy of the release paper to read to his attorney"; Nurse Olinger told him she would bring it later that day, and she did. *Id.* Her notes reflect that the next day, she followed up with him about the release. *Id.* Later that day, Plaintiff requested Tylenol, and Nurse Olinger told him it was not provided at night. *Id.* at 7.

Again, while the failure to provide Tylenol in response to Plaintiff's request might at best rise to the level of negligence, the Court cannot say Nurse Olinger's failure to provide Tylenol once or take additional action in response to Plaintiff's request for Gabapentin, given what a reasonable person in her position would know, indicate that she "would have understood that [Plaintiff's] medical needs subjected [him] to an excessive risk of harm" or knew that her failure to do so "would pose a serious risk to [Plaintiff] and ignored that risk." *Trozzi*, 29 F.4th at 757-

58. Nor has Plaintiff presented clearly established caselaw that would have so informed her. As such, Nurse Olinger is entitled to summary judgment.

*Dr. Tesmond*

Finally, the Court turns to Dr. Tesmond. Plaintiff specifically asserts Dr. Tesmond was deliberately indifferent for failing to personally evaluate him at any point during his 24-day stay, failing to prescribe alternative medication to address Plaintiff's migraines, and withholding his prescription narcotic medications. *See* Doc. 177, at 21. The Court finds Dr. Tesmond is also entitled to summary judgment.

Dr Tesmond testified he was "sure" he was told Plaintiff wanted to see him, and that Plaintiff was requesting medication. (Doc. 159, at 20, 24). He further testified, however, that both medications Plaintiff was requesting – Zomig and Gabapentin – had interactions with Celexa, which he knew Plaintiff was prescribed. *Id.* at 34, 51.

And, although Dr. Tesmond testified that "[d]epending on the conditions", a physician evaluation could be appropriate care for migraines, he did not testify this would always be so. *Id.* at 47-48. Even assuming Dr. Tesmond reviewed all the nursing notes, he would merely have been aware that Plaintiff was previously prescribed Gabapentin and requested it on August 30, September 4, September 5, and September 11. He would further have been aware that Plaintiff was complaining of pain, and was requesting Zomig, but that this was an unconfirmed prescription, and Plaintiff had refused to sign a records release to obtain the relevant records.[11]

---

11. Plaintiff criticizes Dr. Tesmond's testimony, which contradicts other evidence, that nursing staff was only able to confirm Plaintiff was on Celexa. *See* Doc. 177, at 17 ("Dr. Tesmond made his decisions not to aid Mr. Whyde based on his false claim that Mr. Whyde's prescription for Gabapentin had not been verified because he didn't sign a release . . . [and] the doctor likewise falsely testified that the HD staff was only able to confirm Mr. Whyde was on Celexa and nothing else[.]" ). At best, the Court finds this incorrect testimony shows negligence, which is insufficient to establish deliberate indifference.

At base, it is Plaintiff's burden "to produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." *Pineda*, 977 F.3d at 491. Again, the Court finds Plaintiff has not created a genuine issue of material fact to demonstrate Dr. Tesmond – based on the information available to him – "would have understood that [Plaintiff's] medical needs subjected [him] to an excessive risk of harm" or knew that his failure to act differently – such as not prescribing medication or not examining Plaintiff – "would pose a serious risk to [Plaintiff] and ignored that risk." *Trozzi*, 29 F.4th at 757-58. It may not be a best medical practice, or within the relevant standard of care for a physician to fail to personally evaluate an inmate who is in the care of the jail who asks for various medications and complains of pain. But given the information available to Dr. Tesmond, these facts do not rise beyond the level of negligence. The Court cannot find he was deliberately indifferent. Nor has Plaintiff pointed to a specific case that would have informed Dr. Tesmond that his actions, in these factual circumstances, were unconstitutional.

*County Defendants – Sigsworth / Proy*

In the Third Amended Complaint, Plaintiff also brings his deliberate indifference to medical needs claim against Defendants Proy and Sigsworth. (Doc. 74, at 28-31). The County Defendants moved for summary judgment on these claims, asserting Plaintiff could not establish a genuine issue of material fact as to whether either should have been aware Plaintiff was suffering from a serious medical need or acted with the requisite state of mind. *See* Doc. 168-1, at 46-49. In his opposition brief, Plaintiff does not respond to this argument – only responding to the County Defendants' motion as it relates to the excessive force and state law claims. *See* Doc. 179. As Plaintiff has failed to point to evidence creating a genuine issue of material fact as to a deliberate indifference claim against Sigsworth and Proy, the Court finds they are entitled to

53

summary judgment on that claim. *See, e.g., Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (holding that party abandons claim by not responding to argument made in summary judgment motion).

*Monell* Claim

It is well established that a municipal entity may not be sued for injuries inflicted solely by its employees or agents under § 1983. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 (1978). A plaintiff may only hold a municipal entity liable under § 1983 for the entity's own wrongdoing. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) ("Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior.*" (citing *Monell,* 436 U.S. at 692–94)). For a municipal entity to be liable for a violation of § 1983, a plaintiff must show: (1) a deprivation of a constitutional right; and (2) that the municipal entity is responsible for that deprivation. *Doe v. Claiborne Cty.,* 103 F.3d 495, 505–06 (6th Cir. 1996).

Therefore, "[l]iability may be imposed on a county only when a county 'policy' or 'custom' caused the plaintiff's injury and a 'direct causal link' existed between the policy and the purported denial of the right to adequate medical care." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 946 (6th Cir. 2010). To show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015).

Plaintiff cites (1) the Health District's policies prohibiting opioids, Methadone, Zomig, or Gabapentin as the "moving force" behind the violations; and (2) an asserted "clear persistent pattern and practice of not providing necessary medications to jail inmates." (Doc. 177, at 22).

Because, as above, the Court finds Plaintiff has not presented evidence of a constitutional violation, much less a clearly established constitutional violation, as it relates to his deliberate indifference claim, Defendants are entitled to summary judgment on the *Monell* claim. *See Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (affirming summary judgment for the municipality defendant because "[t]he violated right in a deliberate-indifference case thus must be clearly established because a municipality cannot *deliberately* shirk a constitutional duty unless that duty is clear.").[12]

State Law IIED Claim

Both the County and Health Defendants also move for summary judgment on Plaintiff's Ohio law intentional infliction of emotional distress claim. They contend Plaintiff has not presented evidence to create a genuine issue of material fact as to any element of such a claim and that they are entitled to state law immunity.

Under Ohio law, a "claim for intentional infliction of emotional distress requires proof of the following elements: '(1) the defendant either intended to cause, or knew or should have known, that his actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious

---

12. For this same reason, and because as above the Court finds Plaintiff abandoned his claim that the County Defendants acted with deliberate indifference, the County Defendants are entitled to summary judgment on a *Monell* liability claim as well.

mental anguish of a nature no reasonable person could be expected to endure it.'" *Walters v. Carter*, 2020 WL 1066063, at *7 (Ohio Ct. App.).

Ohio Revised Code Chapter 2744 grants immunity to political subdivisions and to employees of political subdivisions for actions arising within the course or scope of their employment.

The County, and the Health District are thus entitled to immunity unless an exception in Ohio Revised Code § 2744.02(B) applies. *See* Ohio Rev. Code § 2744.02(A)(1) ("Except as provided in division (B) of this subsection, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."). As to the County and Health District, Plaintiff "incorporates fully by reference" his prior argument. (Doc. 177, at 23) (citing Doc. 137). As this Court explained previously, addressing that argument:

> Plaintiff cites Southern District of Ohio case law finding Chapter 2744 unconstitutional, but acknowledges the Sixth Circuit has subsequently found it to be constitutional. *See Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 697 (6th Cir. 2006) ("The district court properly held that the Liability Act, Ohio Rev. Code §§ 2744.02, 2744.03, does not violate article I, sections 5 and 16, of the Ohio constitution because the Supreme Court of Ohio has never held the statute unconstitutional and because Ohio's intermediate courts are unanimous in upholding the statute."). Plaintiff presents no further argument that the County or Health District fall within an exception to immunity. As such, the entity defendants are entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim. *See Stephens v. City of Akron*, 729 F. Supp. 2d 945, 965 (N.D. Ohio 2010) (granting statutory immunity to city on plaintiff's tort claims where plaintiff failed to argue any exception to Section 2744.02(B) applies).

*Whyde v. Sigsworth*, 2022 WL 974204, at *25 (N.D. Ohio Mar. 30, 2022). The same is true in the instant case.

As to the individual Defendants, Ohio law grants immunity from civil suits to employees of political subdivisions unless:

> (a) the employee's acts or omissions were manifestly outside the scope of their employment or official responsibilities;
>
> (b) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or]
>
> (c) civil liability is expressly imposed by a section of the Revised Code.

Ohio Rev. Code § 2744.03(A)(6)(a)–(c). Because all the actions at issue in this case were within the scope of Defendants' employment and because civil liability is not expressly imposed by another section of the Ohio Revised Code, Plaintiff must show each individual Defendant acted "with malicious purpose, in bad faith, or in a wanton or reckless manner." *Id.* § 2744.03(A)(6)(b).

"When federal qualified immunity and Ohio state-law immunity under [Ohio Rev. Code] § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense 'through the lens of federal qualified immunity analysis.'" *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009)). "[T]he officers' state-law statutory-immunity defense therefore 'stands or falls with their federal qualified immunity defense.'" *Wright v. City of Euclid*, 962 F.3d 852, 878 (6th Cir. 2020) (quoting *Hopper*, 887 F.3d at 760).

As set forth above, the Court finds Defendants Orzech, Bunting, Proy, Tesmond, Faulkner, Hartson, and Olinger are entitled to qualified immunity. As such, they are also entitled to Ohio state-law immunity on Plaintiff's state law claim. *Wright*, 962 F.3d at 878.

Further still, "Ohio IIED claims rely on testimony from a physician, psychologist, or psychiatrist." *Colston v. Cleveland Pub. Libr.,* 522 F. App'x 332, 340 (6th Cir. 2013)

(citing *Schultz v. Barberton Glass Co.,* 4 Ohio St. 3d 131, 135 (1983) (holding that, in order to "weed out dishonest claims . . . expert medical testimony will help establish the validity of the claim of serious emotional distress")); *see also Flagg v. Staples the Off. Superstore E., Inc.*, 138 F. Supp. 3d 908, 921 (N.D. Ohio 2015) ("Flagg has failed to point to any evidence of injury sufficient to support an IIED claim. In the absence of such evidence summary judgment is warranted."). Plaintiff has not pointed the Court any such expert medical testimony regarding emotional distress here.

As such, the Court finds all Defendants are entitled to summary judgment on Plaintiff's IIED claim.

### CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that the County Defendants' Motion for Summary Judgment (Doc. 168) be, and the same hereby is, GRANTED; and it is

FURTHER ORDERED that the Health Defendants' Motion for Summary Judgment (Doc. 165) be, and the same hereby is, GRANTED.

s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE